{¶ 1} This appeal is from the June 16, 2005 judgment of the Wood County Court of Common Pleas, which granted final judgment to appellee, McMillan E. Kosier, in a breach-of-contract action. Upon consideration of the assignments of error, we reverse the decision of the lower court. Appellant, Frank DeRosa, asserts the following assignments of error on appeal: *Page 152 
 {¶ 2} "1. The trial court erred by claiming Appellant's actions constituted a repudiation and breach of the (oral) contract.
 {¶ 3} "2. Trial Court erred by denying the Appellant's motion for Directed Verdict because it should have held: 1. The Appellee, as a matter of law, was the first to breach the party's agreement(s) and 2. Appellee failed to prove measurable damages to a reasonable degree of certainty.
 {¶ 4} "3. The Trial court erred by shift the burden of proof to the Appellant concerning presentation of credible evidence of damages (lost profit).
 {¶ 5} "4. Trial court erred, and its holding is an abuse of discretion and is arbitrary and capricious, when it claimed the Appellee's Labor expenses, to a reasonable degree of certainty, amount to 50% of the installation and finishing costs.
 {¶ 6} "5. The Trial Court erred in failing to find the Parties entered into a new (written) contract which reformed the original agreement and that the Plaintiff/Appellee not Defendant/Appellant breached the agreement as a matter of law."
 {¶ 7} Appellee, McMillan Kosier, sued appellant, alleging a breach of an oral contract, and sought foreclosure of a mechanic's lien. Kosier alleged that DeRosa has failed to pay Kosier for a hardwood floor he installed on the second story of DeRosa's home. In his answer to the complaint, DeRosa admitted that the parties had a contract for the installation of hardwood flooring at DeRosa's home.
 {¶ 8} The parties stipulated to the following facts. In April 2002, Kosier and DeRosa entered into an oral contract. They agreed that Kosier would install hardwood flooring in DeRosa's home. Kosier was to be paid $4 per square foot for materials for the upstairs, and DeRosa would supply the flooring for the downstairs. Furthermore, Kosier was to be paid $2 per square foot for installation of all of the flooring and $2 per square foot to finish all of the flooring. The square footage for the project was 1,185 square feet for the upstairs flooring and 2,158.25 square feet for the downstairs.
 {¶ 9} In May 2002, Kosier purchased the materials for the upstairs and, in July 2002, he installed nearly all of the hardwood floor on the second floor. He was unable to complete the installation of the flooring because the staircase to the second floor had not yet been installed. Kosier later attempted to remove the flooring in the upstairs hallway but discontinued after a small area had been removed. Kosier was also not able to complete the installation of the downstairs floor because DeRosa had not yet prepared the areas for flooring. The home is still not ready for installation of the downstairs flooring and DeRosa has not made the hardwood flooring available to Kosier. *Page 153 
 {¶ 10} In August 2002, Kosier invoiced DeRosa for the cost of the materials for the second floor and the labor to install the second-story flooring. DeRosa sent Kosier a letter on August 26, 2002, complaining that Kosier had not screwed down the subfloor and that the floors squeaked in numerous areas. He also complained that the workmanship was unacceptable because there was face nailing. DeRosa sent Kosier another letter on October 3, 2002, setting forth their mutual agreement regarding the options that were available to them. DeRosa wrote that they had agreed to the installation of four-inch thick oak floors at $8 a square foot and finished with three coats of a material supplied by Kosier. The great room and kitchen areas were to be installed with material supplied by DeRosa and finished for $4 per square foot. Payment was to be made after all of the flooring was laid and finished. DeRosa also complained again that the installation was poor, with glued one-inch pieces placed at the ends, squeaking, and face nailing. DeRosa agreed that Kosier could either tear out the floor that he had laid or complete the job and be paid at the end if the floors were professionally and satisfactorily installed.
 {¶ 11} In an October 21, 2002 letter, Kosier told DeRosa that he had never complained about the workmanship during the four months between the time Kosier laid the floor and the time that he submitted his invoice. Kosier also stated that the two had met on September 13, 2002, and examined the floor. They found two squeaks near the staircase that would be eliminated when the floor was completed. Furthermore, DeRosa was unable to find any face nailing. Kosier also asserted that he never agreed to wait for payment when he was unable to complete the job, because DeRosa was acting as his own general contractor and was not proceeding to complete the home in a timely manner. Kosier agreed to accept DeRosa's option to remove the second story flooring.
 {¶ 12} In an undated letter from DeRosa to Kosier, DeRosa asserted that Kosier had started to remove some of the flooring, but never completed the job. DeRosa sent Kosier subsequent letters dated December 2003, April 1, 2004, and July 26, 2004, requesting that Kosier complete removal of the flooring and remove the lien against DeRosa's property. DeRosa also indicated in the December letter that Kosier still had a key to DeRosa's property and that DeRosa would treat Kosier's presence on DeRosa's property as trespassing.
 {¶ 13} Steve Drossel, of Drossco Custom Hardwood, examined the hardwood floor laid by Kosier and determined that it needed to be removed and replaced because of face nailing, improper cutting of board lengths, failure to use proper cutting tools, and cupping of the boards due to either a failure to acclimate the materials to their new surroundings or a failure to leave a one-fourth inch gap along the wall for the expansion. *Page 154 
 {¶ 14} At a trial to the bench, the following additional evidence was submitted. Kosier testified that he ordered the hardwood after DeRosa indicated that the home was ready for the flooring. He ordered the wood on May 2 and it was delivered a few days later. He installed all but 35-45 square feet beginning on May 7. However, he also recalled letting the wood acclimate to the house between three to seven days before installation. Kosier was unable to finish the job because the staircase to the second story had not yet been installed. Kosier was unable to install the downstairs flooring because DeRosa had not yet provided the hardwood as agreed.
 {¶ 15} After Kosier sent DeRosa an invoice, DeRosa complained about the quality of Kosier's work. With respect to those complaints, Kosier testified that he never agreed to screw down the subfloor before installing the hardwood floor; he never agreed to avoid face nailing as it is always needed; and he only face nailed a few areas that needed to be tightened. Kosier met with DeRosa in September 2004, and they looked over the floor together. That day, they found only two squeaks, both near the staircase. Kosier believed that installation of the staircase and the remainder of the floor would resolve these squeaks. He also believed that the face nails would not be visible after the flooring was finished. He planned to correct a few other defects in the floor, such as areas where the hardwood was laid all the way to the drywall and a board was cut at an angle, during the finishing stage.
 {¶ 16} DeRosa also accused Kosier of having a subcontractor do the work. Kosier testified that he did 50 percent of the installation. However, he also testified that while he worked with an employee, they split the work evenly. But the employee also worked on his own 50 percent of the time.
 {¶ 17} Although they had agreed to payment when the job was completed, Kosier testified that he had anticipated that the job would be completed in four to six months as was customary. When Kosier realized that the house would not be completed in the near future, he sought payment for the work that he had done. He also testified, however, that he knew that the downstairs would not be finished for a long time.
 {¶ 18} When the parties reached an impasse, Kosier agreed to remove the floor. However, when he attempted to remove the floor, he found that he could not do so without damaging the boards. He decided to leave the floor and file a mechanic's lien instead. However, he never told DeRosa that removal of the floor was not possible.
 {¶ 19} Kosier testified that he sued for the total value of the contract because he was unable to determine what his profit on the job would have been. He simply charges $2 a square foot to lay the floor and $2 to finish it. He had no *Page 155 
idea of the amount of his lost profits in this case because he could not determine the profits before the work was completed.
 {¶ 20} Rick Wilson, a hardwood flooring installer certified by the National Flooring Association, testified that he has been installing hardwood floors for 31 years. He inspected the flooring installed by Kosier at DeRosa's home. He concluded that the floor had been installed properly. He believed that both the face nailing and the use of wood filler were acceptable. Although the floor appears to have grown enough that it eliminated any gap between the floor and the wallboard, he believed that this was due to the floor remaining unfinished for a long period. He was concerned, however, with some areas where there were gaps between the floor and the wall that were too large. This defect led him to believe that the boards had been cut too short. He did not see any cupping in the floor on the day he inspected, but could not conclude that the floor did not cup because the moisture content of the floor changes based upon the conditions. However, if the floor had previously cupped, he would have expected to see gaps between the boards after the floor dried out. He did not see any such gaps during his inspection. DeRosa testified, however, that he had inspected some homes where Wilson, Kosier's expert, had installed the flooring and did not see any face nailing like that approved by Wilson in DeRosa's home.
 {¶ 21} DeRosa testified that he contracted with Kosier after seeing his workmanship at a neighboring house. DeRosa testified that he never asked Kosier to order the flooring. Rather, Kosier insisted on starting the second story flooring, even though DeRosa believed that they were not yet ready for hardwood flooring, because he did not want workers walking on the floor. However, DeRosa acquiesced to Kosier's desire to start installation.
 {¶ 22} DeRosa testified that Kosier agreed to screw down the subfloors. They also agreed to payment after the floors were completed. DeRosa saw Kosier on the site only twice, once to get the key and measure the floor and in September when he came out to inspect the floor after DeRosa complained about the workmanship. Kosier's employee was the only one present when DeRosa was in the home, which was twice a day. He did not complain to Kosier about his workmanship earlier than he did because his wife's illness diverted his attention away from the house construction. However, he did tell Kosier's employee that he was unhappy about the workmanship. He was unsatisfied with the one-inch filler boards, the fact that the end boards did not seem to match, face nailing other than at the beginning and end of the project, denting of the wood, cracking in the wood, and that the floor was not nailed at eight-to-ten inch intervals based on the torn-out area of the floor. When Kosier met DeRosa at his house to inspect the flooring, DeRosa arrived at 7:00 a.m. and discovered that Kosier had *Page 156 
already been in the home and was waiting for DeRosa on the porch. At that time, they were able to discover only two squeaks.
 {¶ 23} DeRosa further testified that Kosier had previously promised DeRosa, when the job was 40 to 60 percent finished, that Kosier would remove the flooring if it was not satisfactory. While eventually DeRosa wrote to Kosier that he should not come onto DeRosa's property without invitation, he never intended that Kosier could not arrange to come in and remove the flooring. DeRosa just wanted to ensure that Kosier did not use the key DeRosa gave him to remove something from DeRosa's property.
 {¶ 24} DeRosa's expert, Steve Drossel, testified about the quality of the floor installed at DeRosa's home. Drossel testified that he owns and operates Drossco Custom Hardwood, has been in business for four years, and that before owning his own company, he worked for someone else refinishing floors. His family is also in the same business and taught him how to install flooring. He had never attended any of the seminars sponsored by the National Flooring Association and he was not certain of the industry standards. His expertise was derived from laying two to three floors during three-quarters of the year for the last four years.
 {¶ 25} He testified that he examined DeRosa's flooring three times. He concluded that the flooring should be removed and replaced because of the face nailing, split boards, improperly cut boards, the failure to leave a gap along the drywall for expansion, and cupping. However, Drossel admitted on cross-examination that the number of occurrences for each defect was small and some could have been caused by environmental conditions in the home. Drossel agreed that it would not make sense to tear out the entire floor because a few face nails existed. Drossel also testified that the flooring could be removed without destroying all of the boards.
 {¶ 26} The court denied DeRosa a directed verdict and granted judgment to Kosier. The court found that DeRosa prevented Kosier from completing the contract when DeRosa sent a letter to Kosier in December 2003 telling him that he was not to enter onto DeRosa's property without permission. The court found that his act constituted a repudiation of the contract and a breach of the contract. Therefore, the court awarded Kosier damages equal to the contract price less the costs Kosier saved by not having to perform the remainder of the contract. The court determined the square footage to be 2,158.25 for the downstairs and 1,185 for the upstairs. The court determined the labor costs for the installation and finishing amounted to half of the installation and finishing charges. The judge found that Kosier had paid his employee $20 per hour. The court also deducted the cost of nails ($200) and polyurethane ($175) that were not needed since the floor was never finished. The final amount awarded to Kosier was $12,201.50, *Page 157 
plus prejudgment interest from October 29, 2002, the date the lien was recorded, and postjudgment interest. The court also found that the lien was valid.
 {¶ 27} In his first assignment of error, DeRosa argues that the trial court erred by finding that DeRosa repudiated and breached the contract by sending Kosier a letter stating that he was not to enter DeRosa's premises without permission. DeRosa contends that his letter, which was sent 14 months after Kosier attempted but failed to remove the upstairs flooring and then filed a mechanic's lien, could not be used to support a finding that DeRosa breached the oral agreement. In his second assignment of error, DeRosa argues that the trial court erred by failing to grant his motion for a directed verdict when Kosier failed to prove damages to a reasonable degree of certainty. In his third and fourth assignments of error, DeRosa argues that the trial court erred in its determination of Kosier's lost profits. In his fifth assignment of error, DeRosa argues that the trial court erred as a matter of law when it ignored the terms of the written contract. All of these assignments of error will be considered together.
 {¶ 28} Upon a review of the stipulated facts of this case, the evidence presented at trial, and the judgment entry, we conclude that the trial court erred as a matter of law by rendering judgment in favor of Kosier.
 {¶ 29} In this case, a dispute arose between the parties concerning a portion of a prior oral agreement, which provided, in part, for Kosier to supply, install, and finish hardwood flooring on the second story of DeRosa's home. Kosier partially performed the contract by supplying and installing all of the upstairs flooring except for a section that could not be completed because the staircase was missing. DeRosa complained that the flooring was not installed properly.
 {¶ 30} After the dispute arose, the parties resolved their dispute by a written agreement. The parties agreed that Kosier would remove the second-story flooring. The written agreement does not provide that the salvageability of the floor was a condition for removal. Kosier made a unilateral mistake in assuming that he could remove the flooring without damaging the boards. Since he is a hardwood flooring installer, he should have known that this could be an issue. DeRosa, however, had no interest in saving the floor. Because Kosier negligently agreed to remove the floor without testing its salvageability, Kosier is bound by his promise to do so. SeeOhio Turnpike Coram, v. Alexanderian, 6th Dist. No. WD-05-060, 2006-Ohio-4301, 2006 WL 2384090, at ¶ 12. Therefore, we find that once Kosier stopped removing the floor, he breached the written agreement to remove the floor.
 {¶ 31} The second part of the oral agreement provided that Kosier would install and finish the downstairs hardwood flooring DeRosa provided. The oral *Page 158 
contract did not specify that DeRosa would supply the hardwood by a certain time. The intervening dispute over the upstairs flooring may or may not have interrupted the installation of the downstairs flooring. However, it is undisputed that DeRosa has never supplied the hardwood to be installed on the first floor.
 {¶ 32} Therefore, even if we accepted the trial court's finding that DeRosa breached the oral agreement by sending Kosier a letter threatening him with trespass if he came on the property, we find that Kosier never proved his lost-profit damages arising from the breach of that portion of the oral contract.
 {¶ 33} The nonbreaching party is entitled to a recovery of lost profits as consequential damages if he is able to prove: "(1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty." Charles R. Combs Trucking, Inc.v. Internatl. Harvester Co. (1984), 12 Ohio St.3d 241,12 OBR 322, 466 N.E.2d 883, paragraph two of the syllabus. The determination of the existence and amount of the lost profits is a question of fact. Bowlander v. Bowlander (Apr. 7, 1995), 6th Dist. No. OT-93-50, at 6, 1995 WL 155161. Therefore, on appeal, we will not reverse the trial court's determination if it is supported by competent and credible evidence. Id. However, a party is entitled to a directed verdict if, "after construing the evidence most strongly in favor of the party against whom the motion is directed, [the court] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *." Civ.R. 50(A)(4).
 {¶ 34} Kosier carried the burden of proving the lost-profit damages, the difference between the price Kosier would have received under the contract less the expense of performance that was saved because of the breach. SchulkeRadio Prods., Ltd. v. Midwestern Broadcasting Co. (1983),6 Ohio St.3d 436, 439, 6 OBR 480, 453 N.E.2d 683, and AllenHeaton McDonald, Inc. v. Castle Farm Amusement Co.
(1949), 151 Ohio St. 522, 526-527, 39 O.O. 330, 86 N.E.2d 782. Such damages are designed to put the nonbreaching party in as good a position as he would have been in if the contract had not been breached. Schulke, supra. Furthermore, Kosier was required to prove the value of his own labor and the number of hours to complete the contract, which must be deducted from the contract price, to determine lost profits. D'Andrea v.Sturges (May 31, 1990), 10th Dist. No. 89AP-1336,1990 WL 72611.
 {¶ 35} The trial court determined that because Kosier testified that he paid his employee $20 per hour and that DeRosa's attorney argued in closing arguments that Kosier's employee did half of the work, Kosier was entitled to half of the $4 *Page 159 
agreed to be paid to install and finish the floor, less the cost of nails and polyurethane. We find that this calculation is not supported by the evidence.
 {¶ 36} Kosier testified at first that he performed half of the work on the job. However, he later testified that his employee worked on the job half of the time by himself. During the time that Kosier was on the job with the employee, they split the work equally. Therefore, at most, Kosier was performing only 25 percent of the labor during installation. However, Kosier testified that his employee would not have done any work relating to the finishing of the floor. Therefore, Kosier would have done all of the labor relating to finishing the floor.
 {¶ 37} Even if we accept the trial court's finding that Kosier did half of the labor and that there was evidence to support the court's finding that Kosier paid his employee $20 an hour, this information does not enable us to determine Kosier's lost profits. Kosier did not present any evidence regarding how many labor hours were required to install and finish the floor. Therefore, there was no means to calculate the cost of the employee's and Kosier's labor, which must be deducted from the contract price. Kosier contends that we must calculate the lost profits based on a square-footage basis. However, even the square-footage charge is the sum total of labor and material costs plus profit.
 {¶ 38} Therefore, we find appellant's first, second, third, fourth, and fifth assignments well taken. Because there was no evidence to establish lost profits, DeRosa was entitled to a directed verdict in his favor. We also find that Kosier's mechanic's lien was not valid.
 {¶ 39} Having found that the trial court did commit error prejudicial to appellant and that substantial justice has not been done, the judgment of the Wood County Court of Common Pleas is reversed. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Wood County.
Judgment reversed.
 PIETRYKOWSKI and SKOW, JJ., concur. *Page 160