[Cite as *MRC Innovations, Inc. v. Lion Apparel, Inc.*, 2020-Ohio-694.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| MRC INNOVATIONS, INC. | : | |
| | : | |
| Plaintiff-Appellant/Cross-Appellee | : | Appellate Case No. 28229 |
| | : | |
| | : | Trial Court Case No. 2015-CV-2880 |
| v. | : | |
| | : | (Civil Appeal from |
| LION APPAREL, INC., et al. | : | Common Pleas Court) |
| | : | |
| Defendant-Appellee/Cross-Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of February, 2020.

. . . . . . . . . . .

WILLIAM B. FECHER, Atty. Reg. No. 0039240, 35 East 7th Street, Suite 315, Cincinnati, Ohio 45202
        Attorney for Plaintiff-Appellant/Cross-Appellee

THOMAS A. KNOTH, Atty. Reg. No. 0034240 and JESSICA E. SALISBURY-COPPER, Atty. Reg. No. 0085038, Austin Landing I, 10050 Innovation Drive, Suite 400, Dayton, Ohio 45342
        Attorney for Defendant-Appellee/Cross-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} On the parties' competing claims related to certain goods that MRC Innovations, Inc. ("MRC") had agreed to provide to Lion Apparel, Inc. ("Lion"), the trial court entered final judgment in favor of Lion in the amount of $57,971.06 (including prejudgment interest of $8,555.06 on a damages award of $49,416), plus post-judgment interest on that total. Both parties appeal from that judgment, challenging two earlier decisions in which the trial court ruled on each party's objections to two magistrate decisions.

{¶ 2} Specifically, MRC challenges portions of both a June 28, 2017 decision in which the trial court granted summary judgment in favor of Lion and against MRC as to MRC's entire complaint and counts one through seven of Lion's counterclaim, and a November 7, 2018 decision in which the trial court awarded Lion pre-judgment interest running from September 20, 2013.[1] Lion's cross-appeal is directed to the November 7, 2018 decision's determination that Lion was not entitled to an award for lost profits as to count seven of its counterclaim. The judgment of the trial court will be affirmed.

## Factual and Procedural Background

{¶ 3} MRC is a corporation that contracts for the manufacture and shipment of apparel and other products. Lion is a corporation that provides personal protective and training gear for civilian and military use, including by firefighters and other first responders. This litigation arises from a series of contracts between MRC and Lion under which MRC was to supply Lion with component parts for a variety of products sold by

---

[1] Neither the June 28, 2017 decision nor the November 7, 2018 decision took the form of a judgment; rather, judgment was entered through a separate filing on November 14, 2018.

Lion. A limited number of the matters raised by the parties' complaint and counterclaims are before us on this appeal.

{¶ 4} On or about March 28, 2012, MRC and Lion reached an agreement for Lion to provide MRC with specifications for a new model of gloves, for which MRC would manufacture the "glove shell component"[2] according to Lion's specifications. (Lion's Motion for Summary Judgment, Exh. E, Affidavit of Dave McClaskey ("McClaskey Aff."), ¶ 5 and Exh. 1 ("Glove Shell Supply Agreement").) The terms of the agreement were memorialized in a letter on Lion letterhead directed to Paul Schwartz of MRC and signed by both Schwartz and McClaskey of Lion. (*See id.*) Under the written agreement, Lion was to purchase at least 7,000 pairs of glove shells at the price of $29 per pair. The agreement also included the following provisions:

5. It has been requested, and Lion has agreed to [sic] in good faith, prepay 30% of the 7000 unit initial master purchase order value as to share in the initial investment risk with MRC. This amount will total $60,900.00.

6. MRC will credit invoices for product shipments until the $60,900.00 investment of Lion is fully accounted for * * *.

7. MRC will need to supply Lion with invoices even when credit is being used to offset payment for record keeping purposes.

* * *

11. MRC agrees to the specified UL quality standards as provided by Lion

---

[2] As explained in the magistrate's December 22, 2016 decision on Lion's motion for summary judgment, "there is a difference between gloves and glove shells[;] * * * the glove shell is placed over the glove and is part of the glove." (Magistrate's Decision, pp. 3-4).

to MRC. As part of their on-going internal quality control program MRC will have all shipments inspected by a third party quality control company of their choosing, using the standard 3%-5% inspection rate. In the event any glove shell(s) do not meet the required agreed upon standards MRC will replace them in a reasonable amount of time not to exceed standard lead times unless otherwise communicated by MRC and agreed upon by Lion. MRC will provide Certificates of Compliance for all goods delivered[.]

12. MRC shall guarantee that product meet [sic] product specifications and shall be responsible for any nonconforming product.

13. Lion's Standard Terms and Conditions shall apply to all purchase orders and releases.

* * *

15. Target Lead times shall be no more than 90 days after issuance purchase order [sic].

(McClaskey Aff., Exh. 1.)

{¶ 5} In April 2012, Lion submitted an initial purchase order for 2,100 glove shell units in varying sizes, specifying that pre-production samples were to be delivered to McClaskey, Lion's designated representative, by June 4, 2012. (McClaskey Aff., ¶ 13 and Exh. 4 ("Glove PO #591249").) The first order of "production" glove shells was to be delivered on or before July 3, 2012. (*Id.*, Exh. 4.) The purchase order stated that "pre-payment of $60,900 equates to initial order of 2100 pair," with "[a]dditional purchase orders to follow." (*Id.*, p. 1.)The purchase order also expressly "incorporate[d] Lion Apparel Terms and Conditions," to be found at a specified website. (*Id.)* The "Terms and

Conditions" in effect at that time included the following:

> If the Purchaser (Lion) has inserted a delivery or completion date on the face of this order, the Purchaser reserves the right to cancel this order if said date is not met or if, prior to said date, after inquiry by Purchaser, Seller (MRC) fails to provide adequate assurance, and Purchaser thereby reasonably believes that the Purchaser's delivery or completion date will not be met. Purchaser also reserves the right to assess a reasonable Penalty or Chargeback if Seller fails to meet its delivery or completion date on the face of this Purchase Order. * * * If a delivery or completion date is not specified on the face of this order, a reasonable time will be allowed. The delivery dates indicated by the Purchaser for the articles, material or work to be supplied under this purchase order are of the essence. Deliveries shall be made by Seller strictly in accordance with the instructions specified herein. All shipments must be packed to conform to Purchaser's specifications, and Purchaser may reject all or part of any delivery based on non-conformance. Failure to meet agreed-upon delivery dates shall be considered a breach of the contract. * * *

(Lion Motion for Summary Judgment, Exh. B, Affidavit of Mark McConnell ("McConnell Aff."), ¶ 6 and Exh. 2.) Lion's revised Terms and Conditions effective as of January 1, 2014 further provided that MRC would provide Lion with copies of the reports from all required inspections. (McConnell Aff., ¶ 6 and Exh. 3, ¶ 11.)

{¶ 6} In early 2013, after the parties had spent months working through modifications to the original glove shell prototypes (*see, e.g.,* McClaskey Aff., ¶ 16-18 and

Exhs. 5-7), MRC produced sample glove shells that Lion approved. (McClaskey Aff., ¶ 19, 21.) Although its first purchase order had not yet been filled, on February 15, 2013, Lion submitted a purchase order for an additional 4,938 pairs of glove shells, to be manufactured in conformance to the approved glove shell samples. (MRC Depo. Exh. 20 ("Glove PO #594699"); McClaskey Aff., ¶ 21.) This purchase order again specified that "pre-production samples must be sent" to McClaskey, and set May 12, 2013 as the deadline for delivery of the production glove shells to Lion. (MRC Depo. Exh. 20, p. 1.)

{¶ 7} Thereafter, MRC encountered ongoing problems with the production glove shells being manufactured in China for Lion, including as to their quality and functionality. (*See, e.g.,* MRC Depo. Exh. 29.) Among the many communications exchanged about the continuing production delays was an April 30, 2013 email in which McClaskey of Lion informed Schwartz of MRC that "[t]here is a lot of demand for these [gloves] right now," emphasizing Lion's need for prompt delivery of the 7,038 pairs of glove shells on order. (MRC Depo. Exh. 31.) However, delays in fulfilling Lion's purchase orders continued.

{¶ 8} When Lion requested that a portion of the completed glove shells be shipped by air freight at a higher cost to facilitate the earliest possible arrival date, MRC advised that all completed glove shells already had been shipped via ocean carrier. (MRC Depo. Exhs. 30-33.) As a result, Lion placed a new purchase order for an additional 2,000 glove shells to be shipped by air. (McClaskey Aff., ¶ 25.) The 2,000 production glove shells delivered to Lion via air freight differed from the previously-approved samples, however; they "were stiff and lacking in dexterity." (*Id.*, ¶ 27-28.) Lion rejected those glove shells. (*Id.*, ¶ 34.) Lion never received any conforming glove shells from MRC. (*Id.*, ¶ 36.)

{¶ 9} Separately, MRC also failed to timely deliver certain outerwear items that

Lion had ordered from MRC from September 2012 through July 2013, purportedly causing Lion "to cancel multiple purchase orders submitted by Lion customers in 2013 and 2014." (McConnell Aff., ¶ 4-13, 16-31, 37-49.)

{¶ 10} An initial complaint that MRC filed against Lion in June 2015 was supplanted by an amended complaint filed on July 30, 2015. Lion's answer to the original complaint included counterclaims against MRC. Relative to the Glove Shell Supply Agreement,[3] MRC's amended complaint set forth separate claims on account, for breach of contract, for specially manufactured goods, and for promissory estoppel. (First Am. Compl., Counts One-Four.) Lion's counterclaims regarding the glove shells set forth causes of action for breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and unjust enrichment. (Lion Answer and Counterclaim, Second-Sixth Claims for Relief.) In addition, relative to the outerwear items ordered from MRC, Lion sought damages in the form of lost profits allegedly attributable to MRC's breach of contract by failing to deliver certain ordered items. (*Id.*, Seventh Claim for Relief.)

{¶ 11} After the parties exchanged discovery, Lion moved for summary judgment as to MRC's amended complaint and its own counterclaims in their entirety. The magistrate to whom the trial court referred that motion issued a decision granting summary judgment in Lion's favor as to all claims related to the glove shells (*i.e.*, MRC's Amended Complaint, Counts One-Four; Lion's Counterclaims, Second-Sixth Claims for

---

[3] MRC's amended complaint set forth additional claims against Lion and another defendant, most of which related to contracts for helmet parts or flannel or other issues that are not relevant to this appeal. Lion's counterclaims likewise implicated certain other issues that are not before us.

Relief) and awarding Lion $49,416 plus post-judgment interest and costs on its glove shell counterclaims. (Magistrate's Decision, 12/22/16.) The magistrate also granted summary judgment in Lion's favor as to the liability aspect of its outerwear claim against MRC (Lion's Counterclaims, Seventh Claim for Relief), but determined that any damages due on that claim must be proven at trial.

{¶ 12} Both parties filed objections to the magistrate's decision. The trial court overruled all of MRC's objections, but sustained Lion's objections in part. (Magistrate's Decision, 6/28/17.) Pertinent to this appeal, the trial court found that Lion was entitled to prejudgment interest on its glove shell damages award of $49,416, despite the magistrate's failure to include a prejudgment interest award in her decision on summary judgment. (*Id.*, pp. 13-14.) The court deferred to the magistrate to calculate the prejudgment interest due.

{¶ 13} The remaining claims (some not at issue on this appeal) thereafter proceeded to a bench trial before the magistrate in October 2017. Among the evidence presented at trial was the testimony of Melissa Kirk, Lion's director of customer sales and service during the time that Lion's outerwear claims against MRC arose. (*See* Excerpt Transcript ("Tr.").) Based on a spreadsheet created from Lion's internal records, Kirk testified that customer orders for outerwear had declined since Lion was forced to cancel customer orders for outerwear due to MRC's failure to deliver ordered outwear items during 2013 and 2014. (Tr. pp. 8-9.) By multiplying the number of customer orders actually canceled by the difference between Lion's cost and selling price for those canceled items, Kirk calculated that Lion's lost profit due to MRC's undelivered outerwear items was

$22,122.18 in 2013 and $21,345.12 in 2014. (Tr. pp. 12-17.)[4]

{¶ 14} On cross-examination, Kirk stated she did not know "the exact date" when she was told to stop accepting orders for outwear items unavailable because MRC was not supplying them. (Tr. pp. 21-26.) Further extensive cross-examination suggested that some canceled orders identified on Kirk's spreadsheet did not correlate with purchase orders evidencing those orders, and other discrepancies also were identified, including as to the purchase prices charged various customers. (Tr. pp. 31-144.) On re-direct, Kirk explained how Lion's procedures and pricing policies could lead to some of those discrepancies; for example, missing purchase orders might have been misfiled or relate to telephone orders with no paperwork, and a customer's purchase order might not correctly reflect current prices or available discounts that Lion would give when entering the price into the spreadsheet software. (Tr. pp. 144-156.)

{¶ 15} Following trial, the magistrate issued a decision awarding Lion prejudgment interest from September 20, 2013 on its award of damages related to the glove shell contract. (Magistrate's Decision 12/21/17.) However, the magistrate determined that Lion was not entitled to an award for lost profits as to its counterclaim related to undelivered outerwear products contracted to MRC. (*Id.*) The trial court overruled the parties' objections to the magistrate's decision (Decision Overruling Objections, 11/7/18.). It entered judgment for Lion in the amount of $57,971.06 plus post-judgment interest from

---

[4] Although Kirk testified on cross-examination that those figures represented "gross profits," not "net profits" after business expenses for "overhead and things like that" were deducted (Tr. pp. 29-31), the trial court reasonably omitted that issue from its discussion of lost profits. (*See* Decision Overruling Objections, 11/7/18, pp. 7-8). Gross profits may be an appropriate measure of lost profits under these factual circumstances. *See, e.g., Digital & Analog Design Corp. v. N. Supply Co.,* 44 Ohio St.3d 36, 40-42, 540 N.E.2d 1358 (1989).

November 14, 2018, representing damages of $49,416 on Lion's glove shell counterclaims plus pre-judgment interest of $8,555.06 from September 20, 2013 through the date of judgment. (Final Judgment Entry.)

{¶ 16} MRC asserts three assignments of error on its appeal from the trial court's judgment:

1) The Trial Court Erred in Concluding that the Funds Paid by [Lion] were a Deposit.

2) The Trial Court Erred in Concluding that [MRC] Did Not Have a Right to Cure.

3) The Trial Court Erred in Determining Pre-Judgment Interest Began on September 20, 2013.

{¶ 17} Lion's cross-appeal raises a single assignment of error:

The Trial Court Erred in Adopting the Magistrate's Decision, Which Awarded Lion No Loss [sic] Profits Despite MRC's Failure To Deliver the Outerwear.

{¶ 18} We will address those assignments of error in the order most conducive to our review.

## MRC's First and Second Assignments of Error

*a. Standard of Review*

{¶ 19} Both MRC's first assignment of error (challenging the trial court's treatment of Lion's initial payment as a "deposit" rather than "investment risk") and second assignment of error (challenging the trial court's rejection of MRC's "right to cure") relate to issues on which the trial court entered summary judgment against MRC. (*See* Decision, 6/28/17.) We conduct a de novo review of a trial court's rulings on motions for summary

judgment. *Schroeder v. Henness,* 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767, ¶ 42. De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence without deference to the trial court to determine whether, as a matter of law, no genuine issues exist for trial. *Ward v. Bond,* 2d Dist. Champaign No. 2015-CA-2, 2015-Ohio-4297, ¶ 8.

### b. MRC's Assignment of Error #1 – Lion's payment as "investment risk"

{¶ 20} Noting that the written Glove Shell Supply Agreement referred to Lion's initial $60,900 payment as Lion's share of "the initial investment risk" (*see* McClaskey Aff., Exh. 1, ¶ 5), MRC first argues that the trial court erred by treating that $60,900 payment as a refundable "deposit." MRC contends that because the entry of summary judgment in Lion's favor denied MRC the opportunity "to have live testimony presented in support of its view of the [Glove Shell Supply] Agreement," that judgment must be reversed. (Appellant's Brief, pp. 5-6.) We disagree.

{¶ 21} In support of its request for summary judgment, Lion presented affirmative evidence to show that its $60,900 payment was a deposit intended to create an account credit against which ordered glove shells would be charged as MRC delivered them. That position was supported by the Glove Shell Supply Agreement's characterization of the $60,900 sum as "prepay[ing]" for 30 percent of the 7,000 pairs of glove shells contracted for,[5] as well as its express provision that "MRC will credit invoices for product shipments until the $60,900.00 investment of Lion is fully accounted for * * *." (*See* McClaskey Aff., Exh. 1, ¶ 5.) To substantiate its understanding of that contract language, Lion produced

---

[5] The $60,900 amount equals 2,100 pairs of glove shells (30 percent of 7,000) times the contract price of $29 per pair.

copies of the initial purchase order it submitted to MRC, on which Lion noted that "pre-payment of $60,900 equates to initial order of 2100 pair." (*Id.*, Exh. 4.) Conversely, in opposing summary judgment and arguing that Lion's $60,900 payment represented "investment risk" that Lion was not entitled to recover, MRC pointed only to the Glove Shell Supply Agreement's unelaborated statement that Lion had agreed to pay $60,900 in order "to share in the initial investment risk with MRC."

{¶ 22} The Glove Shell Supply Agreement does not explain what the parties meant by the phrase "share in the initial investment risk." The interpretation of undefined words in a written contract is a matter of law. *See Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 642 N.E.2d 684 (1995). Courts "interpret words used in contracts according to their plain and ordinary meaning unless another meaning is evident from the face or overall content of the contract, or unless the result is manifestly absurd." *Cheatham I.R.A. v. Huntington Natl. Bank*, 157 Ohio St.3d 358, 2019-Ohio-3342, 137 N.E.3d 45, ¶ 28. The actions of the contracting parties in partially performing a contract also are relevant to the court's interpretation of the meaning of any terms used in that contract. *Nekrosius v. Nekrosius*, 2d Dist. Montgomery No. 13700, 1993 WL 265417, *9 (July 16, 1993), citing *Pavlik v. Consolidation Coal Co.*, 456 F.2d 378 (6th Cir.1972).

{¶ 23} The role of a court in interpreting a contract " 'is to give effect to the intent of the parties to the agreement.' " *Ohio N. Univ. v. Charles Constr. Servs., Inc.*, 155 Ohio St.3d 197, 2018-Ohio-4057, 120 N.E.3d 762, ¶ 11, quoting *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. The term "investment risk" typically is used in conjunction with investments in securities, not prepayments made toward commercial goods. *See, e.g., State v. Herbert*, 49 Ohio St.2d 88, 110, 358 N.E.2d

1090 (1976); *Puhl v. U.S. Bank, N.A.*, 2015-Ohio-2083, 34 N.E.3d 530, ¶ 6 (12th Dist.). Consequently, the parties' intent when using the term "investment risk" in this context can best be derived from the parties' conduct with respect to Lion's $60,900 payment.

{¶ 24} As an initial matter, the Glove Shell Supply Agreement's characterization of the $60,900 as a "prepay[ment]" would seem to be at odds with the proposition that such payment constituted the type of "investment risk" for which MRC now advocates. According to one dictionary defining business terms,[6] "[p]repayments are amounts paid for by a business in advance of the goods or services being received later on. Any payment made in advance can be considered a prepayment." Further, "[a] prepayment is not dissimilar to a deposit," although a deposit "generally [is] a part of the total amount, while a prepayment * * * is a full payment in advance."[7] Here, the Glove Shell Supply Agreement expressly provided that that Lion would "prepay" 30 percent of the total contract value, or $60,900. (McClaskey Aff., ¶ 5 and Exh. 1, ¶ 5.) MRC's invoice to Lion for that amount also referred to it as "[p]re-payment of 2100 pair of Gloves." (MRC Depo. Exh. 14.) Such advance payment of "a part of the total amount" due under a contract is consistent with Lion's $60,900 payment constituting a "deposit." Indeed, MRC's own pleadings described that payment as a "deposit."[8]

---

[6] *See* Debitoor's Accounting Dictionary, "*Prepayments*," https://debitoor.com/dictionary/prepayments (accessed Feb. 20, 2020); *accord Clark Restaurant Co. v. Evatt*, 146 Ohio St. 86, 89-90, 64 N.E.2d 113 (1945) ("Prepayments arise in transactions in which the usual credit relationship is reversed: payment is made in advance of the receipt and utilization of goods and services. * * * Prepayments * * * usually represent items to be consumed in the conduct of the business.").

[7] *See* Debitoor's Accounting Dictionary, *"Prepayments,"* https://debitoor.com/dictionary/prepayments (accessed Feb. 20, 2020).

[8] In its answer to Lion's counterclaim, "MRC admits that the parties agreed that Lion would

{¶ 25} Construing the $60,900 advance payment as a "deposit" also is consistent with the Glove Shell Supply Agreement's express provision that "MRC will credit invoices for product shipments until the $60,900.00 investment of Lion is fully accounted for * * *." (*See id.*, ¶ 6.) Notably, such use of the term "investment" within the contract itself confirms that Lion's "investment" was to be handled as an account credit against which future shipments would be charged. Conspicuously absent is any language specifying conditions that would warrant forfeiture as "investment risk" of any portion of Lion's $60,900 prepayment. Read in its totality, the language of the Glove Shell Supply Agreement compels a conclusion that the "investment risk" contemplated by that contract was limited to Lion's making an advance partial payment in order to help finance the cost of developing a suitable glove shell, with Lion to receive full credit for the amount advanced when the glove shells were delivered in accordance with the parties' agreement. The admission found within MRC's answer to Lion's counterclaim (*see* fn.8) is an additional indication that MRC shared the same understanding of Lion's "investment risk."[9]

{¶ 26} MRC has directed us to no evidence in the record that would indicate the parties mutually understood the term "investment risk" to mean that Lion would lose all or part of its initial payment if MRC ultimately failed to deliver the glove shells as agreed.

---

pay an initial *deposit* of $60,900 to cover the cost of some of the materials required to manufacture the Glove Shells and that such *Deposit* [sic] would be applied to Lion's purchase of the 7,000 Glove Shells." (Emphasis added). (MRC Answer, ¶ 18).

[9] While admissions made in a party's answer may prove dispositive of a disputed issue, *see, e.g., U.S. Bank, N.A. v. Stocks*, 2017-Ohio-8108, 98 N.E.3d 1217, ¶ 58 (2d Dist.) and Civ.R. 56(C) (court to look to pleadings in considering motion for summary judgment), our conclusion that Lion's $60,900 payment was a deposit is not reliant on MRC's use of that word in its answer.

Once Lion produced evidence sufficient to support its proposed reading of the parties' contract, MRC bore a reciprocal burden to "set forth specific facts showing that there [wa]s a genuine issue for trial." Civ.R. 56(E); *see also Dresher v. Burt,* 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). Having failed to sustain that reciprocal burden, MRC cannot avert summary judgment by now claiming that it could have proven its position through "live testimony." (Appellant's Brief, pp. 5-6.) The record supports a legal conclusion that Lion's $60,900 prepayment was a refundable deposit, and demonstrates that no genuine issue of material fact remained for the finder of fact to resolve regarding that legal conclusion. Under R.C. 1302.85(A), Lion was entitled to recover the remaining portion of its deposit (i.e., $40,416).

{¶ 27} Because our de novo review supports the trial court's summary judgment decision treating Lion's prepayment as a refundable deposit, MRC's first assignment of error is overruled.

### c. MRC's Assignment of Error #2 – MRC's right to cure

{¶ 28} In its second assignment of error, MRC contends that the trial court erred in concluding that MRC did not have a right to cure the non-conforming glove shells by providing substitute glove shells to Lion within a reasonable time. According to MRC, the record demonstrates that MRC quickly undertook to procure replacement glove shells, but Lion moved ahead to acquire the goods from another supplier without informing MRC. Those facts, however, do not establish that MRC had a right to cure.

{¶ 29} As codified in Ohio, the Uniform Commercial Code ("UCC") provides that if goods tendered by a seller "fail in any respect to conform to the contract, the buyer may * * * reject the whole." R.C. 1302.60(A). The UCC further provides as follows with respect

to the seller's right to cure after the buyer rejects proffered goods:

(A) Where any tender or delivery by the seller is rejected because non-conforming *and the time for performance has not yet expired*, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.

(B) Where the buyer rejects a non-conforming tender *which the seller had reasonable ground to believe would be acceptable* with or without money allowance the seller may if he seasonably notifies the buyer, have a further reasonable time to substitute a conforming tender.

(Emphasis added.) R.C. 1302.52.

{¶ 30} When a buyer "rightfully rejects" goods tendered by the seller, "the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid[,] * * * recover damages for non-delivery as provided in section 1302.87 of the Revised Code." R.C. 1302.85. Accord *Hollingsworth v. Software House, Inc.*, 32 Ohio App.3d 61, 67, 513 N.E.2d 1372 (2d Dist.1986). Additionally, after such a breach of contract, "the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." R.C. 1302.86(A).[10]

{¶ 31} The record supports a conclusion that Lion appropriately exercised its right

---

[10] "Cover" as used in R.C. 1302.86(A) "envisages a series of contracts or sales, as well as a single contract or sale; goods not identical with those involved but commercially usable as reasonable substitutes under the circumstances of the particular case; and contracts on credit or delivery terms differing from the contract in breach, but again reasonable under the circumstances. The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner * * *." R.C. 1302.86, Official Comment 2.

to "cover" by acting to acquire substitute glove shells from a different supplier instead of continuing to wait for MRC to try to provide goods conforming to the contract specifications. Under the UCC, certain conditions must be met in order for a seller to have a right to cure after the buyer rejects goods the seller tendered – i.e., either the time for the seller to deliver conforming goods "has not yet expired," R.C. 1302.52(A), or the seller must have "had reasonable ground to believe [the tendered goods] would be acceptable" to the buyer and be able to furnish substitute goods within "a reasonable time." R.C. 1302.52(B). Relying on R.C. 1302.52(B), MRC contends that the "reasonable ground" and "reasonable time" provisions implicate issues of fact that could not be resolved on a motion for summary judgment. The record controverts that contention.

{¶ 32} The Glove Shell Supply Agreement provided that the glove shells MRC supplied would be required to comply with "specified UL quality standards" and pass inspection "by a third party quality control company" in order to be acceptable to Lion. (McClaskey Aff., Exh. 1, ¶ 11.) Lion's website terms and conditions further provided that the delivery dates Lion specified were "of the essence," and that "[f]ailure to meet agreed-upon delivery dates shall be considered a breach of the contract." (McConnell Aff., Exh. 2.) Despite those contract provisions, MRC repeatedly failed to meet established deadlines to supply the quality-approved production glove shells Lion needed in order to construct completed gloves to fill customer orders.

{¶ 33} Furthermore, MRC had reason to know that the glove shells shipped to Lion did not conform to Lion's specifications. On July 8, 2013, the "formal inspection report" from MRC's third-party inspection company advised MRC that the glove shells manufactured for Glove PO #594699 did "[n]ot conform." (MRC Depo. Exhs. 36-37.)

Thus, MRC knew when shipping those glove shells that they had not passed an inspection in accordance with the parties' contract. Further, in an email sent to Lion representatives in October 2013, Schwartz of MRC acknowledged that MRC was "aware that the glove [shell]s are useless to you" (Lion). (MRC Depo. Exh. 130, p. 2.)

**{¶ 34}** The record demonstrates that MRC did not have "reasonable ground to believe" the glove shells it produced for Lion's use "would be acceptable" to Lion. As a result, MRC is unable to show that it had a right to cure under R.C. 1302.52(B). In the absence of a genuine issue of material fact as to that issue, MRC could not avoid summary judgment on Lion's glove shells counterclaim based on MRC's supposed right to cure the defective glove shells it delivered.

**{¶ 35}** MRC's second assignment of error is overruled.

### MRC's Third Assignment of Error– Date for Prejudgment Interest

**{¶ 36}** In its third assignment of error, MRC contends that the trial court erred by fixing September 20, 2013 as the date from which prejudgment interest should run on Lion's remaining deposit that MRC did not refund. MRC claims that the parties' contract does not specify when any amount paid by Lion was to be returned, so no funds could be regarded as "due and payable" to Lion until Lion filed its counterclaim on July 2, 2015.

*a. Standard of Review*

**{¶ 37}** Decisions regarding the award of prejudgment interest are reviewed for an abuse of discretion. *Howard v. HCR ManorCare, Inc.*, 2018-Ohio-1053, 99 N.E.3d 429, ¶ 178 (2d Dist.), citing *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 657, 635 N.E.2d 331 (1994). Likewise, a trial court's rulings on objections to a magistrate's decision generally are subject to abuse of discretion review, as "[c]laims of trial court error must

be based on the actions taken by the trial court, itself, rather than the magistrate's findings or proposed decision." *Stumpff v. Harris*, 2d Dist. Montgomery No. 21407, 2006-Ohio-4796, ¶ 17.[11] Under that "highly deferential" standard, *Barton v. Barton*, 2017-Ohio-980, 86 N.E.3d 937, ¶ 98 (2d Dist.), "we will affirm unless we find the trial court's attitude 'unreasonable, arbitrary or unconscionable.' " *Howard* at ¶ 178, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "Decisions are unreasonable if they are not supported by a sound reasoning process." *Id.*

### b. Analysis

**{¶ 38}** As an initial matter, we note that the record on appeal does not include a transcript of the testimony or other evidence as to the issue of prejudgment interest that was presented at the bench trial before the magistrate. MRC, as the party appealing the trial court's decision on that issue, bore "the duty to provide a record which exemplifies the error [it] assigns." *State v. Burkholder*, 2d Dist. Darke No. 1750, 2009-Ohio-5526, ¶ 5, citing *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 400 N.E.2d 384 (1980); *see also* App.R. 9(B)(1). In the absence of a complete record, we are unable to scrutinize the factual bases for the trial court's findings. That omission alone would warrant affirming the trial court's decision. *See Knapp* at 199. Further, the decision itself contains no indication that the trial court abused its discretion with respect to the prejudgment interest award.

---

[11] *But see In re Gill*, 2d Dist. Clark No. 2019-CA-44, 2019-Ohio-4798, ¶ 7, citing *Brunetto v. Curtis*, 10th Dist. Franklin No. 10AP-799, 2011-Ohio-1610, ¶ 10 ("where the appeal from the trial court's action on a magistrate's decision presents only a question of law, the standard of review is de novo"). The exception identified in those cases does not apply here.

**{¶ 39}** In actions for breach of contract, "R.C. 1343.03(A) requires that interest begins to run from the date the debt was due and payable unless otherwise provided in the contractual agreement. " *Wakeman Eagles Aerie No. 4354, Inc. v. Seitz*, 6th Dist. Huron No. H-13-017, 2014-Ohio-1007, ¶ 2. Parties who choose to litigate their duty to pay funds later determined to have been due and payable "will be subject to a prejudgment interest award, not as a punishment but as a way to prevent them from using money then due and payable to another for their own financial gain." *Landis v. Grange Mut. Ins. Co.*, 82 Ohio St.3d 339, 341, 695 N.E.2d 1140 (1998).

**{¶ 40}** Although an award of prejudgment interest is required by law, a trial court exercises its discretion in making a factual determination as to when a debt became due and payable. *See Wakeman Eagles* at ¶ 4-5. Generally, "a trial court has broad discretion in determining the date from which prejudgment interest should be calculated." *Mundy v. Roy*, 2d Dist. Clark No. 2005-CA-28, 2006-Ohio-993, ¶ 26, citing *Horstman v. Cincinnati Ins. Co.*, 2d Dist. Montgomery No. 18430, 2000 WL 1720139, *3 (Nov. 17, 2000). "[C]ourts have adopted a variety of dates to start the running of prejudgment interest, and it is a matter of judicial discretion on the part of a trial court." *Mundy* at ¶ 35, citing *Roberts v, State Farm Mut. Ins. Co.,* 155 Ohio App.3d 535, 2003-Ohio-5398, 802 N.E.2d 157, ¶ 62 (2d Dist.). Determining when a specific sum became "due and payable" in a tort action "is substantially different from a contractual obligation arising out of * * * a sum certain in a written contract." *Stoner v. Allstate Ins. Co.*, 116 Ohio St.3d 1217, 2007-Ohio-6669, 879 N.E.2d 212, ¶ 7 (O'Donnell, J., dissenting).

**{¶ 41}** In adopting September 20, 2013 as the date from which interest would accrue as to the remainder of Lion's deposit, the magistrate found that MRC promised,

but failed, to deliver conforming glove shell samples to Lion by that date. (Magistrate's Decision, 12/21/17, pp. 3-4, 9.) The magistrate reasoned that the remaining deposit became "due and payable" to Lion when MRC knew that it had not delivered the ordered goods in accordance with the parties' agreement. On the record before us, there is no indication that the magistrate abused her discretion in making that factual determination, nor did the trial court abuse its discretion by reaching the same conclusion.

{¶ 42} Although MRC suggests that the date when Lion filed its counterclaim would be a more appropriate starting point for the calculation of prejudgment interest, no legal precedent establishes that Lion's funds on deposit became "due and payable" only when Lion formally demanded their return by initiating a legal action. The trial court did not err by ordering MRC to pay prejudgment interest from September 20, 2013 on the amount of Lion's deposit retained by MRC after that date.

{¶ 43} MRC's third assignment of error is overruled.

### Lion's Assignment of Error – Lost Profits

{¶ 44} In its sole assignment of error, Lion argues that the trial court erred by adopting the magistrate's conclusion that Lion failed to prove with a reasonable degree of certainly the amount of any profits lost due to MRC's breach of the contract for outerwear items. Again, the applicable standard of review is abuse of discretion. *See Stumpff*, 2d Dist. Montgomery No. 21407, 2006-Ohio-4796, at ¶ 17.

{¶ 45} In order for a party to recover lost profits in a breach of contract action, the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty. *Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65, N.E.2d 814 (1988), paragraph one of the syllabus, citing *Charles R. Combs Trucking, Inc. v. Internatl.*

*Harvester Co.*, 12 Ohio St.3d 241, 466 N.E.2d 883 (1984). "The determination of the existence and amount of * * * lost profits is a question of fact." *Tackle Constr. Group, LLC v. Pedtke Ents., Inc.*, 2018-Ohio-1859, 113 N.E.3d 980, ¶ 22 (2d Dist.), quoting *Kosier v. DeRosa*, 169 Ohio App.3d 150, 2006-Ohio-5114, 862 N.E.2d 159, ¶ 33 (6th Dist.).

{¶ 46} " '[T]he difficulty of proving lost profits varies greatly with the nature of the transaction.' " *Advanced Travel Nurses, L.L.C. v. Watson*, 2d Dist. Montgomery No. 24628, 2012-Ohio-3107, ¶ 16, quoting *AGF, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St.3d 177, 181, 555 N.E.2d 634 (1990). In *AGF*, the Supreme Court of Ohio continued:

"If the breach prevents the injured party from carrying on a well-established business, the resulting loss of profits can often be proved with sufficient certainty. Evidence of past performance will form the basis for a reasonable prediction as to the future. * * * However, if the business is a new one or if it is a speculative one that is subject to great fluctuations in volume, costs or prices, proof will be more difficult. Nevertheless, damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like."

*AGF* at 181, quoting Restatement of the Law 2d, Contracts (1981) 146, Section 352, Comment b.

{¶ 47} Although damages must be proven with reasonable certainty, "the amount may be reasonably estimated." *Tackle Constr.* at ¶ 22, quoting *TJX Cos., Inc. v. Hall*, 183 Ohio App.3d 236, 2009-Ohio-3372, 916 N.E.2d 862, ¶ 32 (8th Dist.). " 'Damages are not

rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate.' " *Id.*, quoting *TJX* at ¶ 32, quoting *Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S. 544, 559-560, 61 S.Ct. 379, 85 L.Ed. 336 (1941).

{¶ 48} Under the highly deferential standard of review that applies, we cannot say that the trial court abused its discretion in concluding that Lion did not prove its lost profits with reasonable certainty. The transcript of Kirk's exhaustive cross-examination substantiates the trial court's finding that a significant number of discrepancies existed between the spreadsheet recording customer outerwear orders that Lion canceled and the actual purchase orders produced to evidence those orders. Further, the trial court accurately observed that while Kirk "offered a number of potential explanations" for the discrepancies, she "did not reconcile every difference between" the purchase orders and the spreadsheet on which she relied to calculate the amount of profits lost. (Decision Overruling Objections, 11/7/18, p. 8.) It was within the scope of the trial court's discretion to decide that those multiple unexplained discrepancies warranted a conclusion that Lion had not proven its lost profit amount with reasonable certainty.

{¶ 49} Lion's assignment of error is overruled.

### Conclusion

{¶ 50} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .


WELBAUM, P.J. and TUCKER, J., concur.

Copies sent to:

William B. Fecher
Thomas A. Knoth
Jessica E. Salisbury-Copper
Robert J. Huffman, Jr.
Hon. Michael W. Krumholtz