[Cite as *Revolaze, L.L.C. v. Dentons US L.L.P.*, 2022-Ohio-1392.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

REVOLAZE LLC,                                      :

     Plaintiff-Appellee,                        :

                                             No. 109742

     v.                                                    :

DENTONS US LLP, ET AL.,                       :

     Defendants-Appellants.                   :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 28, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-16-861410

---

## *Appearances:*

Tucker Ellis LLP, Benjamin C. Sassé, and Elisabeth C. Arko; Patterson Law Firm and Kristi L. Browne, pro hac vice; and Warren Terzian, LLP and Thomas D. Warren, *for appellee*.

Jones Day, Yvette McGee Brown, Benjamin C. Mizer, Tracy K. Stratford, Thomas Demitrack, and Ryan A. Doringo, *for appellants*.

Cavitch Familo & Durkin Co., LPA and Gregory E. O'Brien; Robin G. Weaver, *urging affirmance amicus curiae* Ohio Bar Liability Insurance Company.

EMANUELLA D. GROVES, J.:

{¶ 1} Defendants-appellants, Dentons US LLP ("Dentons US") and Mark Hogge ("Hogge"), appeal the trial court's judgment denying their motion for judgment notwithstanding the verdict and entering judgment in favor of plaintiff-appellee, RevoLaze, LLC ("RevoLaze"), in the underlying legal malpractice action. For the reasons that follow, we affirm the trial court's decision.[1]

## Background and Procedural History

{¶ 2} Dentons US is a member of Dentons, a global full-service law firm. Dentons is a Swiss verein (hereinafter the "Dentons verein"), a structure governed by Swiss law that loosely translates to an association. The Dentons verein has offices across the United States, approximately 125 offices in more than 74 countries, and over 6,600 attorneys. Hogge, a partner with Dentons US, chairs the firm's patent-litigation department and has over 35 years of patent-litigation experience.

{¶ 3} RevoLaze is a family-owned business, located in Westlake, Ohio, formed by Dr. Darryl Costin Sr. ("Dr. Costin"), an engineer by training, who has patented ideas for over 20 years. Dr. Costin serves as RevoLaze's chief executive officer, his son Darryl Costin Jr. ("Costin Jr."), as its president, and his daughter, Kimberly, his son-in-law, Ryan Ripley, and Heath Colwell are locally based RevoLaze employees.

---

[1] In rendering this decision, we reviewed the amicus brief filed in support of Dentons US by the Ohio Bar Liability Insurance Company.

## Laser Abrading Technology

{¶ 4} RevoLaze holds patents relating to methods of "laser abrading," which utilizes lasers to create the "worn" and "faded" look on new jeans and other denim garments. The process offered a faster, cheaper, and safer method of creating faded jeans, as well as allowing for more intricate designs on jeans and other denim products. Prior to Dr. Costin's invention, companies used sandblasting or hand sanding to create the worn or faded look on new jeans. Numerous denim companies banned the use of sandblasting because it had been found to be associated with silicosis, which may result in death. Creating the worn or faded look on new jeans took an average of three minutes to achieve by hand sanding, versus 55 seconds using RevoLaze's laser abrading process.

{¶ 5} Initially, RevoLaze monetized its technology by granting licenses to companies in exchange for a lump-sum royalty payment, but was unable to obtain other licensing agreements because most denim manufacturers moved their operations overseas. In addition, because the licensing agreements with these companies involved lump-sum payments, there were no revenue streams for RevoLaze's technology.

## ITC Campaign

{¶ 6} Around 2011, after Levi's Jeans Company ("Levi's") announced that it would no longer purchase jeans from a plant that used the process of sandblasting, RevoLaze began to suspect that denim companies were illegally using its patented technology. As a result, RevoLaze decided to file a complaint in the United States

International Trade Commission ("ITC")[2] against multiple alleged infringers.[3] RevoLaze's ultimate goal was to obtain a general exclusion order ("GEO")[4] to block importation by companies identified as importing infringing products, regardless of whether the infringing party was named as a respondent in the ITC litigation. Because the ITC does not award monetary damages, RevoLaze also decided it would file companion cases in federal district court against the infringers with the objective to negotiate licensing agreements from willing infringers and recover damages from infringers unwilling to enter into a licensing agreement.

{¶ 7} In February 2014, RevoLaze hired Dentons US to litigate the case in the ITC, as well as in other venues. RevoLaze also hired lawyers from Global IP Law Group ("Global"), and MoloLamken LLP ("MoloLamken") to serve as co-counsel, primarily to negotiate licensing agreements with infringing parties that were not going to be included in the case before the ITC. Due to the high cost of litigating a patent infringement case in the ITC, costs ranging between $6-7 million, RevoLaze, following an introduction by Dentons US entered into a separate agreement with

---

[2] The ITC is an independent, nonpartisan, agency of the United States government that investigates whether certain imports are unfair trade practices that harm a domestic industry.

[3] A patent holder can sue more than 15 alleged infringers in one ITC proceeding, which takes 12-18 months, and the ITC can issue an injunction that bars the importation of all infringing products.

[4] In an ITC investigation, a patent owner that proves the elements of its case against the respondents and satisfies other requirements may qualify for a GEO. A GEO excludes the world from importing a certain product into the United States.

Longford Capital ("Longford"), a third-party litigation funder, to pay its legal fees ("Funding Agreement").

{¶ 8} The Funding Agreement was nonrecourse, meaning if RevoLaze was unsuccessful in the ITC, Longford absorbed the loss. If RevoLaze was successful, Longford would recover its investment plus interest and a share of the proceeds flowing from the licensing agreements. As part of the Funding Agreement, Dentons US would discount its rates for all timekeepers by 25 percent and cap their fees and expenses at the amount Longford invested. In exchange, Dentons US would receive a five percent share in some of the proceeds RevoLaze would obtain through enforcing its patents. Dentons US would also be entitled to a portion of the proceeds obtained through litigation of RevoLaze's claims on a contingent fee basis.

{¶ 9} Longford agreed to provide $8 million, less a $285,000 commission to a litigation financing broker. Longford would provide the funding in three phases. Phase I, $3,175,000 to cover all proceedings in any venue against 24 denim brands, ten denim manufactures, and five laser companies, and the respondents in the ITC case. Phase II, $2,134,000 to cover all proceedings in any venue against 13 additional denim brands and two denim manufactures. Phase III, $1,746,000 to cover all proceedings against a list of brands, denim manufactures, and laser companies located in Mexico, China, and Turkey. The Funding Agreement also included a confidentiality clause, which prohibited disclosure of the Funding Agreement to any other party.

**{¶ 10}** On August 15, 2014, Dentons US on behalf of RevoLaze, filed 17 separate lawsuits in the United States District Court for the Northern District of Ohio, Eastern Division, against denim jean companies, alleging infringements of six patents owned by RevoLaze. On August 18, 2014, Dentons US filed a verified complaint under Section 337 of the Tariff Act of 1930 ("Section 337"),[5] in the ITC, against 17 respondents. The complaint sought the previously mentioned injunctive relief, including a statutorily permitted GEO, under 19 U.S.C. 1337(d)(2)(B), to prevent any entity from importing any infringing product into the United States.

## Motion to Disqualify Counsel

**{¶ 11}** On March 11, 2015, The Gap, Inc. ("Gap"), one of the named alleged infringers, filed a motion in the ITC seeking to disqualify Dentons US as counsel for RevoLaze. Gap contended that Dentons US should not be allowed to continue pursuing a complaint against them because Dentons US "[was] a 'portal' of the Swiss verein which represent[ed] Gap on fourteen open matters elsewhere." Gap also alleged that "for more than two decades, Dentons and its predecessor firm[6] have represented Gap in multiple matters around the world, including a recent engagement involving a Canadian Border Service Agency custom audit." *See*

---

[5] Section 337, Tariff Act of 1930, Investigations of Unfair Practices in Import Trade. Under Section 337, the USITC determines whether there is unfair competition in the importation of products into, or their subsequent sale in, the United States.

[6] Salans LLP and SNR Denton merged with a third firm into the Swiss verein Dentons.

*generally Certain Laser Abraded Denim Garments*, Inv. No. 337-TA-930, Order No. 43, 2015 ITC LEXIS 359 (May 7, 2015).

{¶ 12} In addition, Gap alleged that "not only [did] Dentons have an ethical conflict, but Dentons' relationship with Gap meant that Dentons had had an ongoing and unfettered access to Gap's confidential and privileged information relevant to claims and defenses in this [i]nvestigation, including Gap's 'US importation, exportation, financial, and taxation structure, records and information' and accused products." Further, Gap alleged that Dentons did not inform them of the conflict prior to filing suit on behalf of RevoLaze in the Northern District of Ohio or at the ITC, noting it was they who discovered the conflict at the end of January 2015. Finally, Gap alleged that Dentons never sought to obtain a conflict waiver from Gap. *Id.*

{¶ 13} Dentons US opposed the motion on the basis that although Dentons Canada LLP ("Dentons Canada") were members of the Dentons verein, the two members were separate law firms that did not impute conflicts of interest upon each other. As evidence of this separation, Dentons US noted that they and Dentons Canada (1) did not have access to each other's client files; (2) did not share client confidential information unless acting "as co-counsel"; (3) did not share profit and losses; and (4) were financially and operationally separate. Dentons US maintained that all their attorneys and paralegals confirmed that they had not "accessed any files, or received any documents or information from any lawyer, at Dentons Canada LLP or Dentons Europe LLP relating to the Gap." Dentons US continued that there

was effectively an ethical screen in place between it and Dentons Canada; thus, Gap could not be prejudiced. *Id.*

{¶ 14} In addition, Dentons US argued that the retainer agreement Gap signed with Dentons Canada contained a provision waiving potential future conflicts, reasoning that if the instant matter was in fact a conflict, Gap consented in advance. Further, Dentons US offered that Gap only identified the conflict after it was "unsuccessful in obtaining a settlement," "unable to meaningfully contradict [RevoLaze's] allegations of infringement," and had "acknowledged that it had failed to properly identify suppliers of the infringing accused products."

{¶ 15} Gap sought and was granted leave to file a supporting reply. In the reply, Gap disputed Dentons US' account of the facts relating to the timing of Gap's motion and Gap's conduct both during discovery and in settlement talks. Gap also raised additional grounds for disqualification noting that the Funding Agreement between RevoLaze and Longford demonstrated that Dentons US disclosed to RevoLaze, as early as February 2014, that it had a current conflict with the Gap.[7] Gap also noted Dentons had a partial contingency fee arrangement that gave it a heightened interest in the outcome of the investigation. In addition, Gap questioned why Dentons US disclosed the conflict to RevoLaze, but not to Gap. *Id.*

---

[7] On or about September 24, 2014, the respondents in the ITC litigation jointly served upon RevoLaze a first set of requests for production of documents. On October 20, 2014, Dentons US inadvertently produced a copy of the Funding Agreement to all the respondents.

## Disqualification and Aftermath

{¶ 16} In an order issued May 7, 2015, the ITC's Chief Administrative Law Judge ("ALJ") determined that the Dentons verein was a single law firm for purposes of Model Rule 1.7. US and disqualified Dentons US from representing RevoLaze in the ITC, while Gap was a respondent in the investigation.[8]

{¶ 17} Following the disqualification, RevoLaze obtained the services of Global, who had primarily been involved in negotiating licensing agreements with companies that were not part of the ITC case. After assessing the work that was still yet to be done in the ITC case, Global determined that it would need additional assistance, so RevoLaze obtained the services of MoloLamken, as well as Cindy Ahn ("Ahn"), an attorney with the law firm of Schiff Hardin & Waite (collectively, the "replacement lawyers").

{¶ 18} Because the replacement lawyers would not agree to limit their billing as Dentons US had done, RevoLaze sought additional funding from Longford. Longford refused to provide additional funding but agreed to move $1.5 million from the later phases of the campaign to the ITC phase. In exchange for that concession, RevoLaze agreed to limit expenditures on certain aspects of the ITC phase and to provide Longford with a greater share of the proceeds.

---

[8] Dentons sought review of the disqualification order from the ITC. In an order dated April 12, 2016, the Commission issued a notice finding the issue of disqualification moot because the investigation had been terminated against all respondents by settlement, consent order, or withdrawal of the complaint and vacated the disqualification order. *Certain Laser Abraded Denim Garments*, Inv. No. 337-TA-930, Notice of Commission Determination to Review Order No. 43, 2016 WL 10688905 (I.T.C. Apr. 12, 2016).

{¶ 19} With the modification of the Funding Agreement in place, the work yet to be done by the replacement attorneys included, but was not limited to (1) preparing for and defending at least 12 depositions, (2) preparing for respondents' visits to RevoLaze, (3) preparing answers and responses to respondents' numerous discovery requests, (4) preparing "claim construction" arguments and briefs, (5) preparing for and deposing respondents, (6) researching new evidence on the issue of RevoLaze's domestic industry, (7) preparing a brief on the domestic-industry issue, and (8) attempting to negotiate possible settlements with respondents.

{¶ 20} Soon, RevoLaze was indebted to the replacement attorneys more than $1 million. Thereafter, RevoLaze began settling with each respondent that appeared and participated in the ITC litigation. In October 2015, RevoLaze filed a motion with the ITC to terminate the investigation and advised that it was no longer seeking a GEO. In November 2015, the ITC granted RevoLaze's motion and terminated the litigation.

**Civil Complaint**

{¶ 21} In April 2016, RevoLaze filed a civil complaint against Dentons US in the Cuyahoga County Court of Common Pleas. In its second amended complaint, RevoLaze set forth a claim of legal malpractice, alleging that Dentons US breached its standard of care by:

> a. Engaging in conflicted representation of RevoLaze, in direct violation of Rule 1.7 of the Ohio Rules of Professional Conduct;
>
> b. Failing to properly prepare to prosecute RevoLaze claims in the ITC Litigation prior to filing complaint;

c. Failing to engage experts where necessary in the ITC Litigation;

d. Negligently and improperly delegating litigation tasks to RevoLaze in the ITC litigation that would require access to respondents' confidential business information in violation of ITC rules of practice;

e. Failing to develop and employ viable strategy for negotiating settlement of the underlying patent claims;

f. Unilaterally limiting pre-suit investigations in the ITC Litigation as they pertained to potential respondents' importation of infringing products, thereby limiting the scope of any Limited Exclusion Order issued by the ITC;

g. Disclosing the existence and producing copy of the Funding Agreement and the Engagement Letter to the respondents in the ITC Litigation;

h. Failing to communicate with RevoLaze regarding, among other things, conflicts of interest, the disclosure and production of the Funding Agreement and the Engagement Letter, the subsequent motion to compel, and the motions for disqualification, all in direct violation of Rule 1.4 of the Ohio Rules of Professional Conduct;

i. Failing to conduct discovery to any reasonable degree;

j. Failing to abide by the schedule of the joint discovery plan set forth in the ITC Litigation;

k. Failing to address the respondents' inadequate responses to the complaint in the ITC Litigation;

l. Failing to address the respondents' inadequate responses to or refusal to respond to the discovery requests in the ITC Litigation;

m. Failing to identify in the ITC Litigation all denim jean manufacturers that were producing and exporting infringing products into the U.S.;

n. Stipulating without consultation with RevoLaze, that RevoLaze would not rely on the prior Levi settlement license, which would have established the domestic industry argument in the ITC Litigation;

o. Failing to prosecute RevoLaze claims with the intention of ultimately trying the claims either in the ITC Litigation, where much higher

percentage of cases are tried, or in the Phase District Court Litigation; and

p. Submitting settlement demand for $150,000 to H&M through its counsel without the knowledge or approval of RevoLaze.

{¶ 22} RevoLaze further alleged that as a direct and proximate result of Dentons US' negligence and deviations from the applicable standard of care, RevoLaze suffered a series of injuries, including, but not limited to, the following:

a. The loss of enforcement rights on RevoLaze patents;

b. Funds and resources expended developing the claim charts and the Analysis;

c. The loss of leverage in the Litigation resulting from the improper production of the Funding Agreement and the Engagement Letter;

d. The less favorable terms contained within the Amended Funding Agreement resulting from RevoLaze['s] compromised posture as a result of Defendants' series of failures listed above; and

e. Ongoing fees and costs associated with protecting its patents resulting from Defendant's failure to obtain general exclusion order in the ITC Litigation.

## Jury Trial

{¶ 23} The matter proceeded to a jury trial that lasted ten days, with the presentation of 21 witnesses, including nine experts, whose relevant testimony we will set forth in the law and analysis section below.

{¶ 24} At the trial, RevoLaze focused on its position that it suffered significant damages because of Dentons US' false assurances that it had cleared a conflict Dentons US had with Gap. Specifically, RevoLaze claimed Dentons US' disqualification caused (1) increased cost under the renegotiated Funding

Agreement, (2) increased legal fees and expenses in excess of what was covered under the original, (3) lost licensing revenue under a longer term of the VF Corporation license and (4) lost licensing revenues as a result of not obtaining the GEO.

{¶ 25} The testimony established that Dentons US did not notify Gap of the conflict, that Gap did not consent to the concurrent representation, and that Dentons US did not explain to RevoLaze the risk of disqualification. Experts for RevoLaze also opined that RevoLaze would have been able to obtain a GEO, if not for Dentons US' disqualification, which created financial barriers that severely compromised RevoLaze's ability to complete its pursuit of the GEO. RevoLaze's damages expert testified that "but for the disqualification," RevoLaze would have obtained $23,049,769 to $39,280,337 more in licensing revenues with a GEO.

{¶ 26} At the conclusion of trial, the jury found for RevoLaze on its claims that Dentons US' disqualification caused (1) increased costs under the renegotiated Funding Agreement and (2) lost licensing revenues because it did not obtain the GEO. The jury awarded RevoLaze compensatory damages in the amount of $32,262,488.50.

{¶ 27} Dentons US immediately filed a motion notwithstanding the verdict, arguing that the evidence adduced at trial failed to establish that it breached a duty, proximate cause, or certain damages. The trial court denied the motion, stating in relevant part:

Defendants' challenges to the jury verdict repeat legal arguments advanced prior to and during trial. As a consequence, the court was familiar with those arguments and the bulk of the case decisions cited by the parties in these filings. Upon review of the arguments again in this motion practice, the court concludes that the evidence was legally sufficient to support each element of plaintiff's causes of action and therefore the evidence sustains the jury's verdict. The motion is denied.

{¶ 28} Denton US now appeals, assigning the following errors for review:

## Assignment of Error No. 1

The trial court erred in denying judgment notwithstanding the verdict on the element of breach.

## Assignment of Error No. 2

The trial court erred in denying judgment notwithstanding the verdict on lost licensing damages on the element of proximate cause or, at a minimum, by instructing the jury incompletely on this element, thereby requiring a new trial.

## Assignment of Error No. 3

The trial court erred in denying judgment notwithstanding the verdict on lost licensing damages on the element of damages.

## Law and Analysis

### Judgment Notwithstanding the Verdict (JNOV)

{¶ 29} Civ.R. 50(B)(1) allows a party to "serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion[.]" "If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence." Civ.R. 50(B)(3).

{¶ 30} A motion for JNOV is used to determine whether the evidence is totally insufficient to support the verdict. *Soberay v. Greyhound Lines Inc.,* 8th Dist. Cuyahoga No. 106525, 2019-Ohio-1371, ¶ 45, citing *Harper v. Lefkowitz,* 10th Dist. Franklin No. 09AP-1090, 2010-Ohio-6527, ¶ 8. A motion for JNOV raises a question of law because the motion examines the "materiality of the evidence, as opposed to the conclusions to be drawn from the evidence." *Id.*, citing *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.,* 81 Ohio St.3d 677, 680, 693 N.E.2d 271 (1998), quoting *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68-69, 430 N.E.2d 935 (1982).

{¶ 31} Therefore, neither the weight of the evidence nor the credibility of the witnesses is proper consideration for the trial court in ruling on a motion for JNOV. *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976). The evidence "must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support [that] side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied." *Osler v. Lorain*, 28 Ohio St.3d 345, 347, 504 N.E.2d 19 (1986), quoting *Posin* at *id.* A favorable ruling on such a motion is not easily obtained. *Osler* at *id.* This court applies a de novo standard of review to a trial court's order that denies a motion for JNOV. *Ohio Bell Tel. Co. v. Kassouf Co.,* 8th Dist. Cuyahoga No. 101970, 2015-Ohio-3030, ¶ 12, citing *Zappola v. Rock Capital Sound Corp.*, 8th Dist. Cuyahoga No. 100055, 2014-Ohio-2261, ¶ 63.

## Legal Malpractice — Breach

{¶ 32} In the first assignment of error, Dentons US argues the trial court erred when it denied its motion for JNOV on the element of breach in the cause of action for legal malpractice.

{¶ 33} Preliminarily, to establish a cause of action in Ohio for legal malpractice based upon negligent representation, a plaintiff must demonstrate: (1) an attorney-client relationship giving rise to a duty, (2) a breach of that duty and a failure to conform to the standard required by law, and (3) a causal connection between the conduct complained of and the resulting damages or loss. *Skoda Minotti Co. v. Novak, Pavlik & Deliberato, L.L.P.,* 8th Dist. Cuyahoga No. 101964, 2015-Ohio-2043, ¶ 12, citing *Vahila v. Hall*, 77 Ohio St.3d 421, 427, 674 N.E.2d 1164 (1997), syllabus, following *Krahn v. Kinney*, 43 Ohio St.3d 103, 538 N.E.2d 1058 (1989).

{¶ 34} Because the elements of a legal malpractice claim are stated in the conjunctive, the failure to establish any one element of the claim is fatal. *Bohan v. McDonald Hopkins, L.L.C.,* 8th Dist. Cuyahoga No. 110060, 2021-Ohio-4131, ¶ 20, citing *Estate of Hards v. Walton,* 8th Dist. Cuyahoga No. 93185, 2010-Ohio-3596, ¶ 7; *Williams-Roseman v. Owen*, 10th Dist. Franklin No. 99AP-871, 2000 Ohio App. LEXIS 4254 (Sept. 21, 2000).

{¶ 35} In the instant matter, of the above elements, the duty requirement of the first is typically established through the existence of some form of attorney-client relationship. *Natl. Union Fire Ins. Co. v. Wuerth*, 122 Ohio St.3d 594, 2009-Ohio-

3601, 913 N.E.2d 939, ¶ 10. Dentons US does not dispute this element was established given its representation of RevoLaze in the underlying action, until it was disqualified. Because the first element was met, we immediately proceed to discuss the second element – breach of the duty of care.

{¶ 36} An attorney owes to a client the duty to exercise the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession similarly situated and to discharge that duty in a reasonably diligent, careful, and prudent manner. *Simmons v. Rauser & Assocs. L.P.A.*, 8th Dist. Cuyahoga No. 96386, 2011-Ohio-4510, ¶ 7, citing *Palmer v. Westmeyer*, 48 Ohio App.3d 296, 298, 549 N.E.2d 1202 (6th Dist.1988).

{¶ 37} Within the first assignment of error, without conceding that there was a conflict of interest with the Gap, Dentons US contends that the trial court erred in denying the JNOV because the risk of disqualification was unforeseeable as a matter of law. In support of this contention, Dentons US notes a conflict of interest, standing alone, had never served as a basis for disqualification in the ITC.

{¶ 38} Dentons US' contention necessarily implicates Ohio's Prof.Cond.R. 1.7(a)(1)(2) ("Rule 1.7"), regarding conflicts of interest of current clients. The rule states:

> (a) A lawyer's acceptance or continuation of representation of a client creates a conflict of interest if either of the following applies:
>
> (1) the representation of that client will be directly adverse to another current client;
>
> (2) there is a substantial risk that the lawyer's ability to consider, recommend, or carry out an appropriate course of action for that

client will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by the lawyer's own personal interests.

*Id.*

**{¶ 39}** As a backdrop to this segment's discussion, we note that Dr. Costin testified that after litigation funding was put in place, Dentons US indicated that there were potential conflicts of interest with Gap, Ralph Lauren, Target, Diesel, Gucci, and Guess. Dr. Costin stated that Hogge repeatedly represented that the conflict with Gap had been cleared. Dr. Costin stated that on or about August 16, 2014, he received an email from Hogge indicating that Calvin Klein, who was on the original list of respondents, was ultimately not included, because Dentons' Hong Kong office had done work for Calvin Klein in the past. Dr. Costin testified that Hogge then stated, "we don't want to draw a motion to disqualify."

**{¶ 40}** Dr. Costin testified that, subsequently, on February 4, 2015, Hogge informed him of a communication from Gap's attorneys indicating that Dentons US had a conflict of interest and had an ethical obligation to withdraw from representing RevoLaze in the ITC. Dr. Costin stated that he had a severe reaction but felt better after Hogge assured him that there was no conflict and that Dentons US would not be disqualified. Dr. Costin testified that the following month, when Gap eventually filed the motion to disqualify, he had the same severe reaction, but Hogge reassured him that it was not an issue and that the ALJ would never grant the motion.

**{¶ 41}** Dr. Costin stated that on May 8, 2015, Hogge sent him an email stating that Dentons US had been disqualified. When asked about his response upon receiving the email, Dr. Costin testified as follows:

A. Well, I was pretty confident he was kidding me. He was joking with me.

Q. Why did you think that?

A. You can't tell someone over and over and over again that The Gap has no conflicts with Dentons, and rest assured there's no problem * * * and then get something that says we were wrong, we got disqualified. * * * That's why I said, you've got to be kidding me. I thought pretty sure that was it.

**{¶ 42}** Here, whether Dentons US concedes there was a conflict of interest, Hogge's statement to Dr. Costin that "we don't want to draw a motion to disqualify" because Dentons' Hong Kong office had previously done work for Calvin Klein, refutes Dentons' claim that disqualification was not foreseeable. Also, contrary to Dentons US' claim of "separate firms," Hogge's statement indicates his awareness that disqualification was possible even, like in this case, where it was not Dentons US but another member of the Dentons verein, Dentons Hong Kong, that had done work for Calvin Klein in the past.

**{¶ 43}** In addition, Hogge's statement indicates an awareness of what the dangers of "drawing a motion to disqualify" could entail. Arguably, there was a 50/50 chance that the motion could be granted. Therefore, given the awareness of the pitfalls of disqualification, Dentons US by proceeding to include Gap in the ITC litigation, contravened Rule 1.7(a), because its representation of RevoLaze was directly adverse to that of Gap's, a current client of the Dentons verein.

{¶ 44} However, we proceed further because, generally, expert testimony is required to sustain a claim of legal malpractice unless the conduct complained of is "so obvious that it may be determined by the court as a matter of law or is within the ordinary knowledge of a lay person." *Richard C. Alkire Co., L.P.A. v. Alsfelder*, 8th Dist. Cuyahoga No. 104153, 2017-Ohio-1547, ¶ 11, citing *Rauser & Assocs. L.P.A.*, 8th Dist. Cuyahoga No. 96386, 2011-Ohio-4510, ¶ 9, citing *Bloom v. Dieckmann,* 11 Ohio App.3d 202, 464 N.E.2d 187 (1983), syllabus; *McInnis v. Hyatt Legal Clinics*, 10 Ohio St.3d 112, 461 N.E.2d 1295 (1984).

{¶ 45} The testimony of an expert is necessary where the question involves the lawyer's professional judgment in prosecuting or defending an action. *Downie-Gombach v. Laurie*, 8th Dist. Cuyahoga No. 102167, 2015-Ohio-3584, ¶ 78, citing *Cross-Cireddu v. David J. Rossi Co., L.P.A.,* 8th Dist. Cuyahoga No. 77268, 2000 Ohio App. LEXIS 5480, 9-10 (Nov. 22, 2000). Experts have the knowledge, training, and experience to enlighten the jury concerning the facts and their opinion regarding the facts. *Phillips v. Acacia on the Green Condo. Assn.,* 8th Dist. Cuyahoga No. 110636, 2021-Ohio-4521, ¶ 26, citing *Ramage v. Cent. Ohio Emergency Servs.,* 64 Ohio St.3d 97, 102, 592 N.E.2d 828 (1992), citing *McKay Machine Co. v. Rodman*, 11 Ohio St.2d 77, 228 N.E.2d 304 (1967).

{¶ 46} Revolaze presented expert testimony detailing a host of ways that Dentons US violated the conflict-of-interest principles embodied in Rule 1.7 and presented evidence that Dentons US' inclusion of Gap in the ITC litigation created a foreseeable risk of disqualification. Among the expert witnesses presented was

Walter J. Rekstis III ("Rekstis"), who opined that Dentons US had a clear conflict of interest when it included Gap in the ITC litigation.

{¶ 47} Rekstis noted that although Dentons US claimed that they were a separate firm from Dentons Canada, he found no distinction because they were both members of the Dentons verein. Rekstis testified that all the documents he reviewed, including materials Dentons US presented to RevoLaze and to other clients, reflected the opposite — that they were a singular firm. Rekstis added that the Dentons verein's website listed all their lawyers collectively, not separate websites based on different countries or geographic regions and that all their lawyers' email addresses ended with dentons.com. Significantly, Rekstis noted that he reviewed documents that revealed that the Dentons verein had a common conflict base, that they shared confidential information about their clients throughout the verein, across the globe, and dealt with each office as though they were part of one firm.

{¶ 48} Here, we find Dentons US' membership in a verein, with a common conflicts base, that shares client confidential information throughout the organization, is irreconcilable with Dentons US' contention that it was separate from Dentons Canada. Critically, Dentons US by initially identifying Gap as a conflict, even though it had done no work for Gap, strongly indicates that Dentons US did not think it was sufficiently separate from Dentons Canada, to be allowed to represent RevoLaze against Gap. Dentons US' protestations to the contrary, the overwhelming evidence suggests the Dentons verein operated as a single firm. As

such, the model rules regarding conflicts with a current and imputed conflict among members of the firm applied.

{¶ 49} Given this conflict, in accordance with Rule 1.7(b), Dentons was not permitted to proceed without first obtaining informed written consent from both Gap and RevoLaze.

{¶ 50} Rule 1.7(b) provides:

A lawyer shall not accept or continue the representation of a client if a conflict of interest would be created pursuant to division (a) of this rule, unless all of the following apply:

(1) the lawyer will be able to provide competent and diligent representation to each affected client;

(2) each affected client gives informed consent, confirmed in writing;

(3) the representation is not precluded by division (c) of this rule.

*Id.*

{¶ 51} In this respect, Rekstis testified that Dentons US never obtained informed written consent, as prescribed by Rule 1.7(b). Rekstis opined that in not obtaining the requisite consent, Dentons US failed to meet the standard of care in handling the conflict flowing from what amounted to concurrent representation of RevoLaze and Gap.

{¶ 52} Rekstis added that had Dentons US sought to obtain informed written consent, it should have provided RevoLaze with a full explanation of the conflict and of how the litigation could be affected. RevoLaze should also have been advised of the risks involved and, specifically that disqualification was the normal

result, where a court finds there was a conflict of interest. In noting the impact, Rekstis added "so [disqualification] puts you behind the eight ball in that you've gone down the road with somebody putting a case together, then all of a sudden they're not your lawyer anymore."

{¶ 53} Further, Rekstis noted, had Dentons properly sought to obtain the informed consent, RevoLaze would have been provided a list of available alternatives, such as advising RevoLaze to seek independent counsel's legal opinion on the conflict at issue. Also, Dentons US should have suggested that RevoLaze contemplate having conflict counsel on standby to take over the litigation in the event Dentons US was disqualified. Thus, Rekstis opined, Dentons failed to meet the standard of care by the above actions and inactions and thereby breached their duty to RevoLaze.

{¶ 54} RevoLaze presented Robert Krupka, ("Krupka") as an expert witness and he also opined that Dentons US had a clear conflict of interest in concurrently representing RevoLaze and Gap. However, for succinctness, the presentation of Krupka's testimony will be tailored to address Dentons US' specific claim that the disqualification was not foreseeable.

{¶ 55} Contrary to Dentons US' contention, Krupka opined that the risk of disqualification was foreseeable, and that the risk was unreasonably high by including Gap in the ITC litigation. Krupka found significant that Gap had 14 different client relationships with various members of the Dentons verein, so it was foreseeable that Gap would have objected to being sued and thereby provide the

basis for disqualification. Krupka added that although the Dentons verein stated in its literature that it was a verein, with various parts, Gap never expected that they would have been sued by any member of the Dentons verein. Krupka noted that as an illustration of this lack of expectation, Gap, prior to filing the motion to disqualify, sent a letter to Dentons US underscoring that the firm had no right to have brought such a suit.

{¶ 56} Krupka opined that Dentons US breached the standard of care when Hogge, without more, simply communicated to Dr. Costin that the conflict had been cleared and it was okay to sue Gap. Krupka opined that since Dentons US had decided to proceed against Gap, Hogge should have given Dr. Costin a full explanation to the effect that "we can include the Gap because my relationship partner in Canada says it's okay, but we haven't told Gap and there is a risk here because if they complain about it, there could be a problem. We could get disqualified."

{¶ 57} Further, Krupka testified that the very nature of a verein and the way the Dentons verein operated within that structure, as opposed to how they represented themselves to their clients, gave birth to the conflict that led to the disqualification. Krupka pointed out vereins represented less than one-hundredth of one percent of law firms that have chosen to go the route of a verein. In this regard, Krupka stated that he had reviewed several articles that specifically discussed the problems of law firms organizing as vereins. Among them, was an article written by one of Denton's expert witnesses, Douglas Richmond, and his

partner, that "[went] through a very extensive analysis of vereins and conclude[d] in many different places, [vereins were] very dangerous, very risky, very difficult to do it right."

{¶ 58} Krupka opined that, based on the nature of the verein, Dentons US did not meet the standard of care because they did not seek an independent opinion, did not consult with any regulatory body, or confer with the American Bar Association, before including Gap in the litigation. Krupka opined that in the absence of any authority or any ruling that Dentons US could have proceeded against Gap under those circumstances, without being disqualified, constituted a failure to meet the standard of care. Krupka stated he had found the opposite to be true, in that, by proceeding in the manner Dentons US had done, it would lead to disqualification.

{¶ 59} Based on the foregoing discussion, we find that RevoLaze presented legally sufficient evidence for the jury to conclude that Dentons US breached the standard of care by including Gap in the ITC litigation. The expert opinions presented demonstrated that there was a clear conflict of interest, and the opinions presented refute Dentons US' claim that the disqualification was not foreseeable.

{¶ 60} Accordingly, we overrule the first assignment of error.

### Legal Malpractice – Proximate Cause

{¶ 61} In the second assignment of error, Dentons US argues that the trial court erred in denying its motion for JNOV on RevoLaze's claim of lost-licensing damages. Dentons US specifically contends that RevoLaze did not present

sufficient evidence that lost-licensing revenues were proximately caused by a breach of the duty of care because, (1) RevoLaze failed to demonstrate that it would have succeeded in obtaining the GEO and (2) RevoLaze chose to end its pursuit of the GEO while represented by counsel other than Dentons US. In the alternative, Dentons argues that the trial court failed to properly instruct the jury regarding the element of proximate cause.

{¶ 62} We begin our analysis with the standard for proving damages in a legal malpractice action set forth in *Vahila,* 77 Ohio St.3d 421, 674 N.E.2d 1164 (1997), at syllabus, and the clarification of that standard announced in *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.,* 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173.

{¶ 63} In *Vahila,* the Supreme Court of Ohio determined that "depending on the situation, [a plaintiff seeking to recover in a legal malpractice action may be required] to provide some evidence of the merits of the underlying claim," but the court declined to "endorse a blanket proposition that requires a plaintiff to prove, in every instance, that he or she would have been successful in the underlying matter." *Id.* at 428.

{¶ 64} For context, we note, the plaintiffs in *Vahila* alleged losses of $100,000 and lost profits of at least $200,000 as a result of appellee's negligence. *Id.* at 422. Thus, the Supreme Court of Ohio held that "given the facts of [the] case, [plaintiffs] have arguably sustained damage or loss regardless of the fact that they may be unable to prove that they would have been successful in the underlying

matter(s)." *Id.* at 427. The court observed that "the requirement of causation often dictates that the merits of the malpractice action depend upon the merits of the underlying case." *Id.* at 427-428.

{¶ 65} In *Environmental Network Corp.,* the Supreme Court of Ohio, in clarifying its decision in *Vahila*, observed that the *Vahila* Court

> rejected a wholesale adoption of a "but for" test for proving causation and the mandatory application of the "case-within-a-case doctrine." *Id.* at ¶ 16. However, "in holding that not every malpractice case will require that the plaintiff establish that he would have succeeded in the underlying matter, the *Vahila* court necessarily implied that there are some cases in which the plaintiff must so establish." (Emphasis sic.) *Id.* at ¶ 17. "'[D]epending on the situation, [a plaintiff may be required] to provide some evidence of the merits of the underlying claim'" * * *. *Id.* at ¶ 15, quoting *Vahila* at 427-428.

{¶ 66} The *Environmental Network Corp.* Court went on to explain:

> Here, appellees' sole theory for recovery is that if the underlying matter had been tried to conclusion, they would have received a more favorable outcome than they obtained in the settlement. Therefore, unlike the plaintiffs in *Vahila*, who sustained losses regardless of whether their underlying case was meritorious, appellees here could recover only if they could prove that they would have succeeded in the underlying case and that the judgment would have been better than the terms of the settlement. Thus, the theory of this malpractice case places the merits of the underlying litigation directly at issue because it stands to reason that in order to prove causation and damages, appellees must establish that appellant's actions resulted in settling the case for less than appellees would have received had the matter gone to trial.

*Id.* at ¶ 18.

{¶ 67} The Supreme Court of Ohio then concluded that

> [t]his type of legal-malpractice action, then, involves the case-within-a-case doctrine. That is, the plaintiff must establish that he would have been successful in the underlying matter. In this type of action, it is insufficient for the plaintiff to present simply "some evidence" of the merits of the underlying claim. To permit the plaintiff to present

merely some evidence when the sole theory is that the plaintiff would have done better at trial would allow the jury to speculate on the actual merits of the underlying claim. Thus, in the case sub judice, appellees had the burden of proving by a preponderance of the evidence that but for appellant's conduct, they would have received a more favorable outcome in the underlying matter.

*Id.* at ¶ 19.

{¶ 68} In this matter, as previously stated, Dentons US argues RevoLaze failed to present sufficient evidence that it would have succeeded in obtaining the GEO, were it not for Dentons US' disqualification and thus failed to satisfy the case-within-a-case doctrine as outlined above in *Environmental Network Corp.* Dentons US contends that to satisfy the case-within-a-case burden, RevoLaze had to prove the same elements in the legal malpractice case that it would have had to prove in the ITC. Specifically, Dentons claims that RevoLaze had to prove all of the following:

1. The respondents' products were being imported into the United States, sold for importation into the United States, or sold within the United States after being imported into the United States;

2. Those products infringed a valid patent of the party seeking the order;

3. There was a domestic industry in the United States relating to products protected by the patents that existed or was being established at the time of the ITC proceeding; and

4. A GEO was necessary to prevent circumvention of a more limited exclusion order or there was a pattern of violation and it was difficult to identify all sources of infringing products.

{¶ 69} Contrary to Dentons' present contention, we find that Dentons' actions or inactions, some of which we have already discussed, are directly linked to the adverse result of RevoLaze not obtaining the GEO. Through the path outlined

below, we will illustrate how RevoLaze met its burden of proving by a preponderance of the evidence that it would have obtained the GEO, but for Dentons' disqualification. RevoLaze satisfied the case-within-a-case doctrine, even though the matter in the ITC is akin to a police investigation which, unlike the instant matter, would not have culminated with a jury trial, but would have been tried before ITC judges, all of whom possessed extensive expertise in patent, copyright, trademark, and an array of other unfair trade practices matters.

## Patent 972

{¶ 70} Again, we find it useful to begin this segment's discussion with a backdrop. At trial, Dr. Costin testified that RevoLaze's patent, referred to as "972" cracked the proverbial code in laser abrading because the invention allowed the machine to vary or change how fast the laser beam moved while it was being applied to the denim to create the worn look. Dr. Costin described this as "changing it on the fly."

{¶ 71} As previously noted, after discovering that other companies were using its technology without permission, RevoLaze sought legal advice to determine how to address the situation and determined that the best course of action would be to seek redress in the ITC. Dr. Costin testified that none of the law firms consulted, including Dentons, would agree to a contingent-fee arrangement. Dr. Costin recalled that after a long discussion, when Hogge came to visit RevoLaze, Hogge stated "the case doesn't get any better than this, but we can't take it on a contingency." Hogge then indicated that he was going to New York to meet with

some financiers that were in the business of funding litigations that had merit. As a result, the Funding Agreement was established.

{¶ 72} Dr. Costin testified that Hogge indicated that RevoLaze would need to prove three things in the ITC to obtain a GEO.[9] First, importation, that laser abraded jeans were being imported into the United States. To prove importation, Dr. Costin testified that

> we went to the stores and bought jeans from a brand and sent the jeans to a laboratory and confirmed that there were pores in the fibers, and that jean typically has a tag, almost always has a tag on where they were manufactured, and it didn't matter if it was Sri Lanka or Bangladesh or Pakistan or China or Vietnam. So long as they were imported into America, we bought the jean at Gap, we bought it at Levi store, we bought it at Wrangler stores, and that's how we proved importation. And we had to do that for all the brands.

{¶ 73} The second component was infringement, the component in which Hogge thought RevoLaze fell short and had to work on figuring out that element. Dr. Costin testified that RevoLaze could prove that component. Dr. Costin stated that RevoLaze's major investor, Lear, owned a company called Guilford Mills that did a significant amount of work with textiles and knew exactly how to assist RevoLaze in proving infringement. Dr. Costin added that Guilford Mills recommended using the process of scanning electron microscopy.[10] As a result,

---

[9] Dentons U.S. listed a fourth — RevoLaze would also need to prove a GEO was necessary to prevent circumvention of a more limited exclusion order or there was a pattern of violation, and it was difficult to identify all sources of infringing products.

[10] Scanning Electron Microscopy ("SEM") provides high-resolution and high-depth-of-field images of the sample surface and near-surface. The electrons interact with atoms in the sample, producing various signals that contain information about the surface topography and composition of the sample and then provide extremely detailed images.

RevoLaze sent jean samples from every denim brand that was being sued, to outside laboratories specializing in scanning electron microscopy. After scanning, the laboratories were able to provide images of pores in the denim fibers to prove that the worn and faded look was achieved through the use of lasers.

{¶ 74} The third component involved proving that RevoLaze was a solid business, not a patent troll, but a technical domestic industry. This required that RevoLaze present evidence relating to its level of spending in the previous 20 years. RevoLaze had to present evidence such as the number of employees, the equipment owned, the amount of warehouse space, and the number of inventions. Dr. Costin testified that when the respondents visited RevoLaze's facility, presumably to determine whether the company had a domestic industry, they found "we had several million dollars' worth of lasers; we had people; we had trials running; we had jeans stacked up, and it was crystal clear we had a business."

{¶ 75} Dr. Costin testified that based on the steps outlined above, neither Dentons US nor Hogge expressed any concern whether RevoLaze would be able to prove the three components needed to obtain a GEO. Dr. Costin stated that RevoLaze also had Dr. Frank Pfefferkorn, an expert in laser technology from the University of Wisconsin, prepared to present expert testimony on claim construction in the ITC, as well as Dr. Joe Cunning, a leading expert in fiber technology.

{¶ 76} Dr. Costin testified that

Mark Hogge had me convinced, and I believe it to this day, that we had an extraordinary case for general exclusion order because of a) the amount of denim brands that were infringing, b) because of the amount of denim jeans manufactures throughout the world that were infringing, and c) because of all the countries in which lasers were abrading jeans and importing them into the United States. So, Mark had me — and I believe he was correct. He had me convinced that that was an exceptional possibility.

{¶ 77} Here, we find Dr. Costin's testimony established that Hogge and Dentons US believed in the merits of the case which, in Hogge's view "[didn't] get any better than this." Dentons US believed in the case to such an extent that they were motivated to secure third-party funding for the campaign, agreed to capping its fees, and planned to share in the royalties flowing from a successful ITC campaign. We find Dr. Costin methodically outlined for the jury the very components or barriers to achieving the GEO and how they were prepared to address each requirement or hurdle.

{¶ 78} However, Dentons US argues that RevoLaze proffered no expert witness on infringement at the trial and presented no garments for jury examination. However, we do not find this was fatal to RevoLaze's ability to prove the case-within-a-case. Dr. Costin described how using scanning electron microscopy, RevoLaze was able to prove infringement. Further, Dr. Costin testified that he submitted an affidavit to the ITC, providing scans of jeans from all the respondents to document infringement. Notably, despite Dentons US' present assertions, Hogge testified that RevoLaze had the respondents "pinned" on infringement. The record indicates neither Hogge nor Dentons US expressed any

concerns whether RevoLaze would be able to prove what was needed to obtain the GEO.

{¶ 79} Not only did Dr. Costin's testimony above, along with Hogge's own admissions, support the jury's finding that RevoLaze would have obtained the GEO, if not for Dentons US' disqualification but, to be discussed in the next segment, Longford, the third-party funder, believed RevoLaze would have obtained the GEO.

### Longford – ITC Campaign Underwriter

{¶ 80} William Farrell Jr. ("Farrell"), the managing director and general counsel of Longford, testified that Longford made investments in companies that were pursuing meritorious, strong commercial legal claims. Farrell stated Longford's monies were used to pay the attorney fees and expenses that those companies might not otherwise be able to pay. Farrell stated that Longford's investment was focused on three specific areas (1) business-to-business disputes, (2) antitrust, and (3) intellectual property, all areas in which either he, or his partners, who were also lawyers, and previously worked when they were in private practice.

{¶ 81} Farrell testified that Longford's funding is not a loan, but an equity investment, where the only way to recover and make a profit is for the case to be successful. Farrell stated that Longford's business model is attractive to companies that are unable to pay for their lawsuits themselves, because Longford absorbs the loss if the case is unsuccessful. Farrell stated that Longford followed a detailed evaluation process to determine which companies would receive funding and that they were forced to decline 90 percent of the opportunities presented.

{¶ 82} Farrell explained that the evaluation process involves two underwriting stages. First, internally, by the lawyers at Longford, looking at the facts and circumstances of the case, whether there are strong claims against the defendants and whether there are weaknesses in the plaintiffs' claims. Longford studied the litigation histories of both plaintiff's' and defendants' companies to determine whether the company had a high likelihood of settling cases or taking the matters to trial.

{¶ 83} Farrell testified that in the first stage, Longford would need to see a detailed budget and case-management plan by the law firm that would be pursuing the claim, to gain an understanding of exactly what the firm's strategy for winning the case entailed. Farrell stated that Longford insisted that the law firm representing the client got to share in the proceeds of a successful outcome by requiring them to put some risk up front. To share in the proceeds, the law firm had to agree to discount their standard hourly rate.

{¶ 84} Farrell testified that only 20 percent of the opportunities made it through the first stage of underwriting, but those that did, would undergo an independent legal review, by an outside law firm with expertise in the case under consideration. Farrell stated the outside firm evaluated or "double-check[ed]" the case all over, according to their criteria, and without any interference from Longford. Farrell stated that after the independent legal review, the outside law firm shared their opinion with Longford, via a verbal and written confidential presentation. Farrell testified that to move forward, the independent legal review team must think

"that the case is very, very strong and recommend that we invest in it," otherwise cases would get declined at that stage. Farrell stated that Longford still declined about 40 percent of the opportunities that made it through the independent legal review stage.

{¶ 85} Farrell testified that sometime in 2013, Longford was introduced to RevoLaze through Steve Stein ("Stein"), an attorney from Dentons US. Farrell testified there were subsequent meetings with RevoLaze, which included detailed presentations, wherein the company described the potential damages and recovery using data that Longford found impressive. Farrell stated that RevoLaze provided detailed information about the volumes of different companies or the number of jeans that were being sold by respective companies. Farrell stated that the information presented indicated the potential damages

> was in the hundreds of millions of dollars, even approaching a billion, I believe. But whenever, to be honest, whenever I see a billion dollars, I kind of discount that likelihood. But even if we discounted it 50 percent or 60 percent, we were still in the hundreds of millions of dollars, which was very interesting to us.

{¶ 86} Farrell testified that Longford proceeded to take the RevoLaze opportunity through the first stage of the evaluation process and stated that because it was a patent case, Longford broke the analysis into four categories, (1) the validity of the patents, (2) evidence of infringement by the defendants, (3) damages — the most important consideration for Longford as an investment company, and (4) the strategy — focusing on the strengths and capabilities of the legal team, their objectives and expected outcomes from the client.

{¶ 87} Farrell testified that Longford remained very interested after RevoLaze went through the first stage of the underwriting process and decided to move forward with the independent legal review, using a law firm with patent experience. Farrell stated that during the second phase, Dentons US was required to submit a detailed budget for the various stages of the enforcement campaign, as this would determine how much Longford would invest.

{¶ 88} Farrell testified that during the vetting process both Dentons US and Hogge expressed a strong belief in the ITC campaign. Farrell testified in pertinent part as follows:

> Q. Prior to entering into this agreement, what was it that you did to vet the validity in this case, validity of the patents?
>
> A. We reviewed the patents themselves. We reviewed some of the history of the patents and looked at prior art of the patents, one of the issues that could raise concern for us.
>
> Q. And did you subsequently have any concerns after you'd done that review?
>
> A. No.
>
> Q. And what was it you did as regards to infringement?
>
> A. Same thing. We looked at the material that had been presented to us * * *. And it turned out that we were able to do an independent review on an Internet search with the assistance from either Dentons or RevoLaze showing us, you know, we should go look at this company's website or that company's website, and there were a couple of companies bragging about the use of laser-abraded technologies on their jeans, which seems like pretty strong evidence that would support the claims that were being considered.
>
> * * *

There were a couple of articles, independent articles that had nothing to do with RevoLaze about the abrading of jeans that we also found compelling. * * * So there was this marketing component to laser abrading that it was faster, it was cheaper, but also it could actually save lives. And we liked that quite a lot at Longford, so that was one of the other things we took into consideration.

Q. And did you form a view after you'd reviewed that information about the strength of the case around infringement?

A. I did. There were other bits of evidence that I found pretty compelling, as well. There was that type of evidence, but at one point before funding the case, we saw some more technical and detail analysis, as well. I think it had to do with microscopic analysis of the fibers and threads in certain jeans to prove that they were done through lasers and not through sanding, so that confirms evidence of infringement. So yes.

Q. Did anyone at Dentons ever raise any concerns about validity of the patents to you?

A. Validity, we talked about lots of issues, I bet. There were a couple of prior art, pieces of prior art that had been identified and we asked questions about to make sure we had a proper response to them and that we felt comfortable overcoming those examples of prior art. But that's our business. We're always looking for defenses and weaknesses to figure out what we could expect and try to get answers to those. And we got, sufficient answers to proceed.

Q. So Dentons didn't express any concerns about the infringement?

A. Not the fact that companies were using lasers. There was, a question about how we would be able to identify all the different companies that would be infringing because a lot, like I said, a lot of the manufacturing was being done outside the United States, you know, in countries that are pretty hard to access.

{¶ 89} Farrell testified that when the motion to disqualify was first brought to Longford's attention and he spoke with Hogge, he took great comfort in knowing that "it was [Hogge's] position that this was just a typical defense tactic and there was no merit to the idea that they were going to be disqualified and there was

nothing to worry about." Farrell testified that around the same time, there was also a motion to compel filed by certain respondents in the ITC case. Farrell explained that one of Dentons US' attorneys mistakenly provided a copy of the funding agreement to all the lawyers that represented the respondents. When the mistake was discovered, Dentons US' lawyers sought the return of the document, claiming privilege and that it had been inadvertently provided. Farrell stated that the respondents honored the request, but had already read the agreement, thought they should be entitled to a copy, and filed a motion to compel in the ITC.

{¶ 90} Farrell testified that later the team at Dentons US became more concerned that maybe the motion to disqualify required a response and that it would be litigated and argued before the ITC. Farrell stated that sometime after, Hogge indicated that the motion to disqualify was serious and it had been turned over to Dentons US' general counsel. Farrell testified that around that time, he met with Hogge to discuss the case generally and the impact of the motion to disqualify. During the meeting, Hogge indicated that Gap was utilizing the motion to disqualify to disrupt RevoLaze's ITC case.

{¶ 91} Farrell stated that it was during that meeting that Hogge indicated for the first time that "we're not ever going to make it to an ITC hearing in this case. * * * It's going to be, you know, done before we get there." Farrell testified that he did not have a reaction to Hogge's statement, but after the meeting conferred with Dr. Costin, who indicated that the idea of not taking the case all the way to an ITC

hearing was new information. Farrell testified that from the beginning of Longford's decision to fund the case,

> achieving an exclusion order was very valuable to us and we felt that would be important for lots of reasons, including because we were unable, we were told, by RevoLaze and by Dentons, to be able to identify all the many foreign companies that might be importing denim into the United States in violation of RevoLaze patents. So a general exclusion order acts to expand the injunction beyond the named respondents like the Gap, to any company attempting to cross our border. And so that was viewed as very valuable. And so, the only way to achieve that exclusion order was to go to a hearing.

{¶ 92} Finally, Farrell testified that prior to Gap filing the motion to disqualify, Hogge had not expressed any concern about the strength of the case before the ITC. Farrell stated that Hogge said, "Things were going well. Everything was on track. I mean, the best example I recall being very, very pleased when we found out that the investigation had been instituted, which is a critical part of an ITC action."

{¶ 93} Here, we find, through Farrell's testimony, RevoLaze presented evidence that supported the jury's determination that RevoLaze would have obtained a GEO. Longford invested $8 million to finance the campaign, a decision made after a thorough vetting of the case's merit, both internally and by independent legal counsel. Relevantly, during the evaluation, Longford carefully examined the strengths and weaknesses of the case, as well as the possible defenses by the respondents. Specifically, Longford scrutinized the validity of the patents and had no concerns that a GEO was unobtainable. Although Dentons US now contends that validity would have been a hurdle, Farrell testified that neither Hogge nor Dentons

US expressed any concerns about the validity of the patents and that prior to the advent of the motion to disqualify, Hogge indicated that "things were going well. Everything was on track."

{¶ 94} We conclude Farrell's testimony clearly demonstrated to the jury that Longford's decision to fund RevoLaze's ITC campaign was not cavalier, but instead, one well thought out, well investigated, and well calculated based on the merits of the case and the strong indicia of success. We find based on the detailed analysis undertaken, Longford expected the return of, and a return on, its $8 million investment, by virtue of RevoLaze obtaining the GEO. Again, as borne out through Farrell's testimony, Dentons US in agreeing to cap its fees to share in the future benefits demonstrated its belief that the GEO was obtainable.

### Charles Schill – ITC Expert

{¶ 95} RevoLaze presented the expert testimony of Charles Schill ("Schill"), who began work in the general counsel's office at the ITC in 1975, focusing on Section 337 cases, wherein GEOs are sought. Between 1979, when Schill left the ITC, until his retirement in 2018, his universe of work focused on Section 337 cases. Over this span, Schill handled more than 140 cases including 22 trials, and successfully obtained more than 12 GEOs.

{¶ 96} Schill testified that it is not difficult to get a GEO if you had the right case, adding: "case with a lot of respondents, with simple technology, and something easy for somebody else to manufacture." Schill opined that RevoLaze would have obtained a GEO, specifically stating:

Well, I think I've described a few fact scenarios for you of cases that I've had where we've been able to get general exclusion orders. This is a similar type of fact situation. You have one, lots of respondents, there were 17, I think in the original [c]omplaint and then more added thereafter.

We have a technology while not simple in some ways, it's something that can be tested for, I think, in a fairly easy way.

Also, something that would not be so expensive that small companies overseas could manufacture — could set up manufacturing operations with a couple of lasers to do this kind of operation.

So easy entry, lots of people, hard to know where all the product is coming from because there's lots of sources of supply and lots of routes for it to get into the country because there are lots of retailers who want to sell distressed denim items.

So those are the kinds of factors you look at when you say is this a potential candidate for a general exclusion order case, and the answer to that is yes.

* * *

[F]rom everything I've seen in this case, I think that RevoLaze would have been able to obtain a general exclusion order if they had gone all the way through the case as was originally set up by Dentons.

{¶ 97} Schill elaborated by listing factors that boded well for RevoLaze. In relevant part, Schill stated:

[T]he [c]omplaint set out exhibits that showed who the importers were that they had products.

* * *

They had set forth information that met all the commissions' rules on whether we could enter or whether you could start that kind of case, get it instituted by the full commission, and they did in fact get it instituted.

And then the — a number of companies had settled out of the case, so you're reducing the number of parties who are potentially going to show up at trial. That was another one of the criteria we talked about as far as timing, motions, summaries, determination, for example.

Made it easier to do something like that to have the order, have a general exclusion order issued without going to trial.

So, for those reasons, I think that based on the facts of the case and the style of the product, and that sort of thing, that there were lots of reasons why you'd think that this case would be successful.

{¶ 98} Here, the jury heard testimony of the above ilk, from an expert witness of Schill's background and experience, which was ostensibly pivotal in them concluding that RevoLaze would have obtained a GEO, if not for Dentons US' disqualification. Significantly, Schill testified that RevoLaze's case mirrored the fact situation of cases that he had conducted, which resulted in the plaintiffs getting a GEO. Schill testified that like the other cases, RevoLaze had a lot of respondents, had technology that could be easily tested and had technology that was not overly expensive. All factors that allowed small companies overseas to quickly set operations to make infringing products. In addition, RevoLaze's case presented a situation where the infringing products enjoyed easy entry into the United States.

{¶ 99} Schill testified that RevoLaze had set forth information that met the rules of the ITC commission to get the case instituted and that RevoLaze had in fact managed to get the case instituted by the full commission. Schill found it significant that several companies had settled out of the case, which reduced the number of respondents that would have appeared for trial. Based on the facts of the case, Schill concluded that RevoLaze would have been successful in obtaining a GEO.

{¶ 100} The path outlined above illustrates that RevoLaze presented evidence that satisfied the case-within-a-case burden by presenting testimony, including Hogge's admissions, going to the very heart of the evidence that would

have been presented in the ITC to secure the GEO. Based on the foregoing discussion, after construing the evidence most strongly in favor of RevoLaze, we find the evidence presented was legally sufficient to satisfy the case-within-a-case burden of proving by a preponderance of the evidence that they would have been successful in obtaining a GEO, had Dentons US not been disqualified.

{¶ 101} Nonetheless, Dentons US argues the trial court failed to properly instruct the jury regarding the element of proximate cause.

{¶ 102} A trial court is obligated to provide jury instructions that correctly and completely state the law. *Simbo Props. v. M8 Realty, L.L.C.,* 8th Dist. Cuyahoga No. 107167, 2019-Ohio-4361, ¶ 18, citing *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22, citing *Sharp v. Norfolk & W. Ry.,* 72 Ohio St.3d 307, 312, 1995- Ohio 224, 649 N.E.2d 1219 (1995). The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review. *Id.*, citing *Cromer* at ¶ 22, citing *Estate of Hall v. Akron Gen. Med. Ctr.*, 125 Ohio St.3d 300, 2010-Ohio-1041, 927 N.E.2d 1112, ¶ 26.

{¶ 103} In this matter, Dentons US contends the case-within-a-case doctrine requires instructing the jury on the underlying case, and not merely the elements of a legal malpractice case. To that end, Dentons US proposed standard jury instructions for patent cases created by the Federal Circuit Bar Association. The trial court refused and instructed the jury in pertinent part as follows:

> If you find Mark Hogge was negligent, you will decide whether his negligence directly caused harm to RevoLaze.

Now, here RevoLaze claims Mark Hogge caused four types of injury to it. If you find Mark Hogge was negligent, you must consider each type of alleged loss separately and determine whether RevoLaze proved the alleged loss by the greater weight of the evidence.

\* \* \*

Now, for the harm described in items 1 through 3 above, the instructions given to you already are sufficient.

However, for the harm caused in number 4, the lost licensing revenue that RevoLaze would have received if it had received a general exclusion order in the ITC action, well, Ohio law places an additional requirement on causation. It is this:

Before you can find that this alleged harm was caused by Mr. Hogge's negligence, you must also find that RevoLaze proved by the greater weight of the evidence that it would have succeeded in obtaining a general exclusion order in the ITC action, absent Mark Hogge's negligence. And that RevoLaze would have received additional revenue from new license agreements.

{¶ 104} It is worth revisiting that in a legal malpractice action, involving the case-within-a-case doctrine, the Supreme Court of Ohio stated that appellees had the burden of proving by a preponderance of the evidence that but for appellant's conduct, they would have received a more favorable outcome in the underlying matter. *Environmental Network Corp.,* 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 19.

{¶ 105} Here, the trial court advised the jury of the additional requirement of finding that "RevoLaze proved by the greater weight of the evidence that it would have succeeded in obtaining a general exclusion order in the ITC action, absent Mark Hogge's negligence. And that RevoLaze would have received additional revenue from new license agreements." The instructions, herein, comport with the relevant

advisement necessary to satisfy the case-within-a-case doctrine outlined in *Environmental Network Corp.* As such, we find Dentons US' contention not well-taken.

{¶ 106} Finally, Dentons US argues that RevoLaze failed to present legally sufficient evidence of proximate cause of lost licensing damages, because RevoLaze abandoned pursuit of the GEO months after Dentons US was no longer its attorneys.

{¶ 107} Relying on *E.B.P., Inc. v. Cozza & Steuer*, 119 Ohio App.3d 177, 694 N.E.2d 1376 (8th Dist.1997), in suggestion of a waiver defense, Dentons US argues that a malpractice plaintiff that settles the underlying case fails as a matter of law to prove proximate cause, unless it can show that the attorney "ma[d]e an error that compromised [the plaintiff's] claim." *Id.*

{¶ 108} However, the facts and circumstances of this case renders Dentons US reliance misplaced. In *E.B.P.*, we also stated:

> We do not suggest a settlement of the underlying action always operates as a waiver of a client's malpractice claim against his attorney. A settlement entered into as a result of an attorney's exercise of reasonable judgment in handling a case bars malpractice claim against the attorney. *DePugh v. Sladoje*, 111 Ohio App.3d 675, 676 N.E.2d 1231 (2d Dist.1996). However, a legal malpractice claim is not barred when the attorney has acted unreasonably or has committed malpractice per se. *Id.* "When an attorney has made an obvious error which seriously compromises his client's claim, and a settlement is on the table * * *, the client should not be forced to forego the settlement offer as a condition of pursuing the attorney for malpractice." *Id.* See, also, *Monastra v. D'Amore*, 111 Ohio App.3d 296, 676 N.E.2d 132 (8th Dist.1996) (where attorney's defective representation diminishes client's ability to reach a successful settlement or to succeed at trial, the settlement of the action should not imply a waiver of client's right to file legal malpractice action against attorney).

*Id.* at 182.

{¶ 109} Here, unlike *E.B.P.,* RevoLaze's decisions to terminate the ITC campaign and settle with various respondents was driven by the devastating impact of Dentons US disqualification. We note, the record reveals that at the time the disqualification order was issued, Dentons US had been involved in the ITC campaign for approximately 433 days, had billed $2.7 million in legal fees, and $800,000 in expenses out of the budget for the first phase of the Funding Agreement. Yet, as previously mentioned, a significant amount of work was still unfinished to prepare for the hearing to secure the GEO. Dr. Costin testified that with mounting fees, he was facing a "black hole" of debt and could not go any further.

{¶ 110} Although Dentons US argues that RevoLaze could still have pursued the GEO, Hogge testified as follows:

Q. Do you recognize the bottom email from you?

A. Yes.

* * *

Q. So this is after you told Dr. Costin about the disqualification order, correct?

A. Yes.

Q. And in the third paragraph, last sentence, you say, Darryl is fighting for working capital now to keep his company going, correct?

A. Yes.

Q. So, at this time, you knew that RevoLaze was fighting for working capital?

A. After the disqualification order?

Q. Yes.

A. He told me that.

Q. You were aware of it?

A. After the disqualification, I thought the question was when it came down, did I know. I didn't know until after.

{¶ 111} Despite Dentons US present contentions, they were aware that RevoLaze was not able to continue pursuing the GEO. By Hogge's own admission, Dr. Costin was fighting to keep RevoLaze alive. As such, RevoLaze's decision to terminate the ITC litigation or settle with various representatives is unlike *E.B.P.* and does not constitute a waiver.

{¶ 112} Following our review of the record, we find that RevoLaze simply could not pursue the ultimate objective of obtaining the GEO, after Dentons US was disqualified. As such, we find Dentons US contention not well-taken.

{¶ 113} Accordingly, we overruled the second assignment of error.

### Legal Malpractice – Lost Licensing Damages

{¶ 114} In the third assignment of error, Dentons argues the trial court erred by denying the JNOV on the claim for lost licensing damage.

{¶ 115} A plaintiff seeking damages in a legal malpractice case must show that the alleged malpractice caused the damages. *Fabec v. Frederick & Berler, L.L.C.,* 8th Dist. Cuyahoga No. 110562, 2022-Ohio-376, ¶ 22, citing *Montali*, 8th Dist. Cuyahoga No. 80327, 2002-Ohio-2715, at ¶ 37. In addition, the evidence must establish a calculable financial loss because one of the essential elements of a legal malpractice claim is a causal connection between the conduct complained of and

resulting in damage or loss. *DeMeo v. Provident Bank*, 8th Dist. Cuyahoga No. 89442, 2008-Ohio-2936, ¶ 61, citing *Nu-Trend Homes v. Law Offices of DeLibera, Lyons & Bibbo*, 10th Dist. Franklin No. 01AP-1137, 2003-Ohio-1633, ¶ 42.

{¶ 116} Within this assignment of error, Dentons US argues that RevoLaze failed to satisfy the claim for lost-licensing damages. Redeploying a previous argument, Dentons US contends RevoLaze remains able to pursue licensing revenues through further litigation.

{¶ 117} As we have previously discussed, RevoLaze presented evidence that the disqualification seriously compromised the company's quest for a GEO. In the previous segment, we concluded, from the evidence presented, that RevoLaze was not financially able to pursue the GEO following Dentons US' disqualification. Dentons US' contention also ignores the significant cost and time involved in pursuing a GEO, plus the futility due to the limited life span of patents.

{¶ 118} In addition, although RevoLaze was able to settle with various respondents, the record reveals that Dentons US' disqualification negatively impacted RevoLaze's negotiating posture, and the resulting settlements did not create the risks of double recovery. Expert witness, Krupka, opined that Dentons' disqualification totally disrupted RevoLaze's ability to negotiate licensing agreements with the respondents. Specifically, stating:

> And if you can put yourself in the shoes of one of the respondents who is going to start negotiating a license with RevoLaze, and RevoLaze is suddenly in disarray. They now have new attorneys that don't really know the history of the case. They're scrambling to try to catch up and work on this stuff and if I'm one of the respondents, I'm thinking, hmm,

maybe I can get the cheaper deal now or maybe the case will all fall apart and we won't be able to do a trial, so I'm going to hold out. And, based on what I've read of the people who were involved in the licensing negotiations after that, that's pretty much exactly what happened.

{¶ 119} Here, RevoLaze presented sufficient evidence for the jury to find that disqualification of Dentons US compromised both the ability to pursue the GEO and to negotiate settlement with any semblance of leverage. As such, we find Dentons US' contention not well-taken.

{¶ 120} Within this assignment of error, Dentons US argues that RevoLaze failed to satisfy the claim for lost-licensing damages because its proof of damages rested solely on the testimony of its expert witness Justin Lewis ("Lewis"), which Dentons US claim was erroneous, contained unwarranted assumptions, and was unduly speculative.

{¶ 121} In Ohio, the plaintiff carries the burden of proving the lost-profit damages, the difference between the price plaintiff would have received under the contract less the expense of performance that was saved because of the breach. *Gerber v. Riordan*, 2012 U.S. Dist. LEXIS 135379 (N.D. Ohio, Sept. 21, 2012), ¶ 11, citing *Kosier v. DeRosa*, 169 Ohio App.3d 150, 158, 2006-Ohio-5114, 862 N.E.2d 159 (2006). Damages are not recoverable beyond an amount that can be established with reasonable certainty. *Id.*, citing *Knott v. Revolution Software Inc.*, 181 Ohio App.3d 519, 529, 2009-Ohio-1191, 909 N.E.2d 702 (2009) (citing *Acoustic Marketing Research, Inc. v. Technics, L.L.C.*, 198 P.3d 96 (Colo.2008)).

{¶ 122} In this matter, RevoLaze hired damage expert Lewis to determine and calculate the economic damages. Although Lewis testified about the process he utilized to calculate the four categories of claimed damages RevoLaze alleged, Dentons US primarily focuses its arguments on the calculations relative to the lost licensing damages stemming from not acquiring the GEO.

{¶ 123} In this respect, Lewis opined that if RevoLaze had obtained the GEO, it would have been able to license a total of 80 percent of the U.S. laser abraded denim market and based on royalty rates of between 10 cents and 15 cents per unit, RevoLaze would have generated between $26 million and $39 million in royalties. Dentons US characterizes the opinion as mere assumptions and too speculative to satisfy RevoLaze's burden of proof.

{¶ 124} However, Lewis detailed the methodology he utilized to determine the damages. First, Lewis had to determine the U.S. market share of denim units coming into the U.S. that would be subject to the GEO. Lewis conferred with industry experts, one of whom, Ken Kiser ("Kiser"), testified at trial. Lewis also reviewed research reports, WiseGuys Consulting ("WiseGuys"), as well as data from QYR Consumer Goods Research Global Denim Fabric Professional Survey Report.

{¶ 125} The research revealed that 1.3 billion units came into the U.S. in 2016, 1.4 billion in 2017 and industry experts projected a growth rate of 8.9 percent through 2021, the end of the patent. Lewis testified that further research indicated that a growth rate of 8.9 percent was a reasonable projection to determine how many units would be imported into the U.S. and subject to the GEO.

{¶ 126} Second, Lewis had to determine what percentage of the denim units coming into the U.S. were laser abraded. Lewis again consulted with industry experts and reviewed reports. WiseGuys estimated that 27.5 percent of the worldwide denim market consisted of laser abraded products in 2017 and another article indicated that by 2020, that number would be as high as 50 percent. Lewis testified he utilized both figures as baselines to calculate the compound annual growth-rate to determine that four billion units would be laser abraded items through 2021.

{¶ 127} Third, Lewis determined how much of the U.S. denim market RevoLaze would have been expected to license if the GEO had been obtained. Lewis testified that it would be atypical to get 100 percent of a market like denim, "because there are large [companies] and there are smaller [companies] and the smaller [companies] are too small to try to go after." Lewis looked at the larger companies and after detailed discussions with industry experts determined that it would be reasonable to expect that RevoLaze would have been able to license 80-85 percent of the market if they had obtained the GEO.

{¶ 128} Lewis decided to apply the lower end of the range, 80 percent, which he considered to be very conservative. Lewis stated he settled on an 80 percent expectancy through what he termed a "bottom-up approach," focusing on the larger company's market share and found that expectation reasonable. Again, Lewis testified he took comfort in the 80 percent expectation after considering that RevoLaze had managed to license about 50 percent of the market without a GEO.

{¶ 129} Fourth, Lewis subtracted the units already licensed by RevoLaze from the 80 percent potential units that could be licensed with the GEO. Lewis stated that when he was privy to the per-unit rate for manufacturers that already had a license agreement with RevoLaze, he made the deduction based on the actual units under license. While in cases where it involved a lump sum royalty or where the per unit figure was unavailable, Lewis deducted the market share. Lewis stated, "[s]o, for example, for Levi's, the industry reports indicated that Levi's had 11.4 percent market share, so instead of deducting based on their royalty reports, I wiped out 11.4 percent of the U.S. market for laser-abraded garments."

{¶ 130} Fifth, Lewis determined the appropriate royalty rate per unit. To do that, Lewis evaluated the license agreements RevoLaze had already negotiated, dividing them in three categories namely: (1) pre-disqualification, which revealed that the largest companies, Levi's and VF, were getting the best rates of 15 cents to 40 cents per unit; (2) post-disqualification, wherein new firms were trying to settle, and rates would drop to between 10 cents and 25 cents per unit, but cluster around 10 cents per unit; (3) post-ITC, wherein the rates were consistently around 10 cents per unit, sometimes 15 cents or 20 cents, depending on the party.

{¶ 131} Sixth, Lewis then applied royalty rates of between 10 cents and 15 cents per unit to the unlicensed denim units to arrive at the lost royalty results of $53.7 million to $80.5 million. Lewis testified that even though he used very conservative assumptions, there would still be some uncertainty when doing projections. To account for a measure of uncertainty, Lewis calculated the discount

rate back to the date of the disqualification. Lewis employed what is called "risk adjusted hurdle rates," which are rates based on the kinds of risks involved in deploying technology into markets that venture capitalists would expect to receive. Lewis determined that because RevoLaze's technology was being introduced into a well-known, well-understood industry, such as denim, he concluded that RevoLaze fell in the low-risk category of 20-30 percent. Lewis then applied a 20 percent discount rate.

{¶ 132} Seventh, utilizing a 20 percent discount rate, Lewis arrived at $26,186,891 in present value of lost royalty at ten cents per unit and $39,280,337 in present values of lost royalty at 15 cents per unit. Lewis stated "by applying this 20 percent discount rate, we went from $80 million in lost royalties down to 40. We went from $53 million down to 26. So, this discount rate cut those lost royalties in half to account for any remaining risks in achieving them."

{¶ 133} Despite the detailed explanation Lewis presented, which we have summarized above, Dentons US claims the expectation that RevoLaze could license 80 percent of the U.S. denim market underscores the speculative nature of Lewis' opinion. However, we note, Lewis was confident in the projection of the 80 percent expectation after considering that RevoLaze had managed to license about 50 percent of the market without a GEO. Arguably, RevoLaze having captured 50 percent of the market, albeit under less than favorable terms, without a GEO, capturing another 30 percent of the market would not be unrealistic with a GEO.

{¶ 134} Denim industry expert, Kiser, who worked for several major brands and mills, including American Eagle Outfitters, JC Penney, and Jones Apparel, over a period spanning 27 years, testified that if Revolaze had a GEO, they could expect to license most of the industry within a few months of obtaining the order. Kiser testified that denim importers, particularly the major companies, would not risk the significant penalties, litigation costs, damages, and reputational harm by importing infringing products, if Revolaze had a GEO.

{¶ 135} Significantly, Lewis testified that when Dentons US' damage expert, Robert Brlas ("Brlas") questioned the WiseGuy's data, and suggested Euromonitor as a better source for estimating the market, Lewis did calculations based on the Euromonitor's data. Lewis noted that although Euromonitor focused only on the U.S. jeans industry and although Brlas did not make any calculations, he ran the report through his module. Lewis adjusted the Euromonitor data to account for nonjeans denim garment, which was covered in WiseGuys and used the same assumptions as Brlas.

{¶ 136} Lewis testified about the results as follows:

So using the Euromonitor data, at 10 cents a unit, you get $23,049,769 and if you use the 15 cents royalty rate you get $34,574,645.

So what you'll see is even using the Euromonitor report, what [Brlas] thinks is better data, and even making only a five percent adjustment for non-jeans, you would basically get damages that are very similar and within the same range as you get from data I had originally relied.

{¶ 137} Here, where the assumptions of Dentons US' damage expert substantially correlates to that of RevoLaze's, we cannot consider Lewis' calculations speculative.

{¶ 138} Finally, Dentons US argues the 80 percent market share projection was speculative and should have been excluded because it relied on the withdrawn opinion of another expert.

{¶ 139} In Ohio, the information upon which an expert may rely includes a review of applicable treatises, formal classes, discussions with colleagues, books of science, and information gained from other experts in the field. *Werts v. Goodyear Tire & Rubber Co.*, 8th Dist. Cuyahoga No. 91403, 2009-Ohio-2581, ¶ 31, citing *Limle v. Laboratory Corp. of Am.*, 137 Ohio App.3d 434, 738 N.E.2d 890 (10th Dist.2000). An expert may also draw upon knowledge gained from other experts in the field, whether this knowledge was communicated orally or in writing. *Id.*, citing *State v. Echols*, 128 Ohio App.3d 677, 716 N.E.2d 728 (1st Dist.1998).

{¶ 140} We stated previously that Lewis conferred with industry experts, one of whom was Kiser, also reviewed industry research reports, such as WiseGuys, as well as data from QYR, to formulate his calculations and projections. Our review of the record indicates that Lewis laid the proper foundation before testifying about how he arrived at the 80 percent market share figure. In addition, Lewis was cross-examined on the matter. Further, we have found herein that the 80 percent figure was not speculative and found significant that when employing Dentons US' own

damage expert's assumptions, Lewis arrived at substantially the same result. As such, we find the present assertion not well-taken.

{¶ 141} Accordingly, we overrule the third assignment of error.

{¶ 142} Judgment affirmed.

It is ordered that appellees recover from appellants the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA GROVES, JUDGE

EILEEN A. GALLAGHER, P.J., and
EILEEN T. GALLAGHER, J., CONCUR